Albert E. LANIER, Plaintiff, Appellant,

v.

Michael FAIR, etc., et al.,
Defendants, Appellees.

No. 88–2046.

United States Court of Appeals,
First Circuit.

Heard Feb. 27, 1989.

Decided June 1, 1989.

Richard L. Neumeier, with whom Rebecca J. Wilson and Parker, Coulter, Daley and White, Boston, Mass., were on brief, for plaintiff-appellant.

Robert M. Mendillo, Asst. Atty. Gen., Criminal Bureau, with whom James M. Shannon, Atty. Gen., Boston, Mass., was on brief, for defendants-appellees.

Before CAMPBELL, Chief Judge, and COFFIN, Senior Circuit Judge, and FUSTE,* District Judge.

FUSTE, District Judge.

Plaintiff-appellant Albert E. Lanier filed this action under 42 U.S.C. section 1983 alleging that his due process rights were violated by his removal from a halfway house program and by the rescission of his previously established "reserve parole date." The case was submitted to the district court on cross motions for summary judgment, whereupon defendants' motion was granted and appellant's was denied. At the district court level appellant sought declaratory and injunctive relief, as well as monetary damages. Prior to oral argument appellant withdrew his claim for injunctive and declaratory relief and now only the damage claim remains.[1] For the reasons discussed below, we affirm the decision of the district court.

## I. BACKGROUND

The relevant facts are as follows. At the time of the events giving rise to this action, appellant Lanier was in custody of the Commonwealth of Massachusetts pursuant to two state convictions for rape and one conviction for robbery.[2] On February 1, 1984, the State Parole Board voted to assign Lanier a "reserve parole date" of May 25, 1984, with the conditions of residence, work, and supervision for drugs. This meant, arguably, that appellant would be paroled on May 25, 1984, provided that he found a job and a place to live, agreed to be supervised for drugs, and that his conduct was otherwise acceptable. Additionally, the Parole Board recommended that Lanier be transferred from a medium security prison to a pre-release facility prior to his reserve date. Such facilities generally provide their residents with greater opportunities for employment and interaction with the community. In early April 1984 Lanier was transferred from prison to a minimum security halfway house facility in Boston called "Brooke House" that operated under

---

* Of the District of Puerto Rico, sitting by designation.

1. Because appellant has withdrawn his request for injunctive and declarative relief, we need not address the issue, argued extensively in the briefs, of whether this section 1983 action should have been brought as a petition for habeas corpus. *See Preiser v. Rodriguez,* 411 U.S. 475, 494, 93 S.Ct. 1827, 1838, 36 L.Ed.2d 439 (1973) (finding that a damages action by a state prisoner may be brought under the Civil Rights Act in federal court without any requirement of prior exhaustion of state remedies). We also need not address whether the action has been rendered moot by appellant's subsequent parole. *See e.g., Weinstein v. Bradford,* 423 U.S. 147, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975).

2. Appellant was given a twenty-fifty year sentence for rape and a five-ten year concurrent sentence for robbery in February 1968. In May 1969, appellant received an eighteen-fifty year concurrent sentence for another rape conviction arising from a different incident.

the auspices of Massachusetts Halfway House, Inc. ("MHHI") and the Massachusetts Department of Correction ("DOC"). Prior to becoming a resident of Brooke House, Lanier signed a community release permit and a community release agreement. These agreements were also signed by employees of the DOC and MHHI. Appellant was furnished a copy of the MHHI Program Standards.

On May 8, 1984, around 4:00 a.m., Lanier was found to be missing during a routine bed check. A jacket was allegedly stuffed under Lanier's blanket and a window was found open, thus leading Brooke House employees to believe Lanier had attempted to escape. Lanier denies the business about the jacket and claims he was taking a shower during his absence. In any event, he was located approximately a half hour later. The incident was immediately reported to defendant-appellee John W. Noonan, the acting DOC duty officer, who authorized Lanier's return to higher custody. The appellant was transferred to MCI–Concord at approximately 6:00 a.m. on that same morning without a prior hearing and was charged with being "out of place." A disciplinary hearing was held on June 14, 1984, at which time the charge was dismissed.

Six days after Lanier was transferred from Brooke House, defendant-appellee Lynn Ferraris, a supervising parole officer, recommended in a memorandum addressed to the Parole Board that Lanier's reserve parole date be rescinded. Appended to the memorandum was a report from appellant's counsellor at Brooke House delineating numerous rule infractions Lanier allegedly committed while in the Brooke House program, including the May 8th incident. On May 17, 1984, Ms. Ferraris updated her memorandum recommending rescission with recently received information alleging Lanier's participation in illegal activities in the state of Maine during a prior parole.

No action was taken by the Parole Board until May 31, 1984, at which time a three-person panel provisionally rescinded appellant's May 25 reserve parole date.[3] Lanier was not afforded notice and a hearing at this time. On July 20, 1984, the Parole Board conducted a final rescission hearing. Lanier received notice of the charges against him[4] and was represented by a law student who submitted a memorandum on his behalf responding to each of the allegations. Soon after the hearing the Parole Board voted to affirm the provisional rescission. In a written notice the Parole Board reported that this action was based on Lanier's return to higher custody and on various enumerated infractions of Brooke House program standards, including the charge of being out of place on May 8, even though that charge had been dismissed after the June 14 disciplinary hearing. The Parole Board then recommended that the DOC transfer Lanier to a pre-release facility for a six-month period. Once transferred, Lanier would receive a review by the Parole Board after five months, and if he had performed satisfactorily in the program he would be paroled at the end of this six-month period without having to appear before the Parole Board again.

On August 8, 1984, Lanier received a DOC reclassification hearing to determine whether he should remain in higher custody or be returned to a halfway house. At this hearing, which occurred three months after his removal from Brooke House, the DOC determined that Lanier should be kept in a medium security prison.

On March 6, 1985, Lanier filed a petition for writ of habeas corpus in Norfolk County Superior Court, complaining that the Parole Board had rescinded his reserve parole date of May 25, 1984 without due process. On June 27, 1985, the Superior Court entered an order partially granting Lanier's request for injunctive relief and set aside the rescission of Lanier's reserve parole date. A preliminary injunction followed on July 9, 1985. However, the Pa-

---

**3.** One vote to provisionally rescind Lanier's parole date was cast on May 21, 1984 with the concurrence of the other two members of the Parole Board panel not coming until May 31.

**4.** Lanier disputes the adequacy of the notice, as we will discuss in Part II of the opinion.

role Board promptly appealed the Superior Court's ruling, and Chief Justice Greany of the Massachusetts Appeals Court issued a memorandum and order dissolving the injunction.

On March 5, 1986, the Supreme Judicial Court affirmed the dissolution of the preliminary injunction in *Lanier v. Massachusetts Parole Board*, 396 Mass. 1018, 489 N.E.2d 670 (1986). In a brief opinion the Court concluded that Lanier had not met his burden of showing a likelihood of success on his claims that the Parole Board violated his rights under Article 12 of the Declaration of Rights of the Massachusetts Constitution and the fourteenth amendment of the United States Constitution. *Id.* Thus, the case was sent back to the lower courts for a trial on the merits.

The instant case was filed in October of 1985, and the complaint was amended in May of 1986. The amended complaint alleged two federal claims: (1) that Lanier had a liberty interest in remaining at Brooke House such that he could not be transferred to higher custody without due process; and (2) that Lanier had a protected liberty interest in his reserve parole date such that rescission of the same without an adequate hearing violated due process. Lanier also alleged various pendent state law claims brought under the Massachusetts Civil Rights Act, G.L. c. 12, §§ 11H–11J.

The district court granted summary judgment in favor of defendants on both of Lanier's federal claims. First, assuming without deciding that Lanier had a liberty interest in remaining at Brooke House, the district court nonetheless held that defendants were entitled to qualified immunity with respect to any alleged violation of that right. Second, the district court held that Lanier did not have a liberty interest in his reserve parole date and was thus not entitled to a hearing before it could be rescinded. We affirm the district court's dismissal of both of appellant's federal claims, although we do so for reasons other than those expressed by the court below.

## II. THE HALFWAY HOUSE CLAIM

### A. *Liberty Interest*

The first issue is whether appellant had a liberty interest in remaining at Brooke House. Only if we find a liberty interest do we need to inquire into whether appellant received an adequate hearing concerning his transfer to higher custody. Customarily, the court has looked for a liberty interest both in the fourteenth amendment and in various state law sources.

The Supreme Court has held that when a prisoner is still under confinement the due process clause itself does not convey a liberty interest in the conditions or degree of confinement as long as these are "within the sentence imposed" and are "not otherwise violative of due process." *Hewitt v. Helms*, 459 U.S. 460, 468, 103 S.Ct. 864, 869, 74 L.Ed.2d 675 (1983). Moreover, we have held that a prisoner has no constitutionally-derived liberty interest in remaining in a halfway house, and that any liberty interest a prisoner might have against recommitment to a higher security prison must be derived from state law sources. *Brennan v. Cunningham*, 813 F.2d 1, 6 (1st Cir.1987); *Garcia v. De Batista*, 642 F.2d 11 (1st Cir.1981). The question, therefore, is whether the Commonwealth of Massachusetts, through its statutes, regulations or practices, can be said to have created a protected liberty interest by allowing appellant to participate in a halfway house program. *Id.* at 14. As we noted in *Brennan*, to establish a liberty interest deriving from state law, a prisoner must show

> "that particularized standards or criteria guide the State's decisionmakers." If the decisionmaker is "not required to base its decisions on objective and defined criteria," but instead "can deny the requested relief for any constitutionally permissible reason or for no reason at all," ... the State has not created a constitutionally protected liberty interest.

*Brennan v. Cunningham*, 813 F.2d at 6, quoting *Olim v. Wakinekona*, 461 U.S. 238, 249, 103 S.Ct. 1741, 1747, 75 L.Ed.2d 813 (1983) (citations omitted).

We turn first to review state regulations as a potential source of the alleged liberty interest. The Massachusetts regulations concerning transfer from a community-based program such as a halfway house to a prison are found in 103 CMR 420.7, subsections (6)[5] and (7).[6] These regulations contemplate a multi-step decision-making process in transferring an inmate from a community-based program. First, it is the responsibility of the program officials to determine "that the individual is not suited for that program or that the program is not meeting the individual's needs." At that point the program director or his designee is required to contact DOC officials who in turn are to schedule a reclassification hearing to review the case and make appropriate recommendations regarding future placement either in another community-based program or in a higher security facility.

Significantly, these subsections do not include substantive standards governing either termination from a community-based program or reclassification to higher security. Although they contemplate that termination must be made based upon a finding of an individual's fitness for a program, they do not themselves set the criteria on which to base such a finding and in fact merely outline the procedures to be followed. Standing alone, these regulations do little to advance appellant's cause, as it is well settled that regulations that merely establish reclassification procedures without outlining substantive guidelines do not in themselves convey a protected liberty interest. *See Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 871, 74 L.Ed.2d 675 (1983); *Parenti v. Ponte*, 727 F.2d 21, 24 (1st Cir.1984).

Appellant, however, does not base his claim to a liberty interest solely on the procedural regulations discussed above, but rather points to the "Manual of Operations for Community Reintegration Centers" ("Manual") and the MHHI "Program Standards," both of which contain rules governing the operation of halfway houses in Massachusetts. The Manual and the Program Standards constitute an important part of the contract between the DOC and the MHHI for the administration of halfway houses. The guidelines set forth therein are binding on both MHHI and the DOC. *See* Manual, section 2.0. Moreover, when a halfway house is operating in accordance with these guidelines, it is de-

---

**5.** *Transfers from Community Based Programs.*
To insure consistency and continuity in decision-making, the recently created Department Classification Committees designated at the various institutions shall be the vehicle for classifying persons to and from community-based program. [sic]
Said committees may be reconvened in the event that it is determined by a program that the individual is not suited for that program or that the program is not meeting the individual's needs.
103 CMR 420.07(6).

**6.** *Process for Reclassification.*
(a) It is the responsibility of the program director of the community-based program or his designee to contact the Deputy Commissioner for Classification and Treatment when it is found that the resident is not suited for the program or vice versa and as a result, there is a possible need for a classification review. In turn, the Deputy Commissioner for Classification and Treatment will schedule a reclassification review at the earliest time to review said case. He will contact the chairperson of the committee that recommended the current placement in a pre-release program.

The Chairperson has responsibility for contacting the members of the committee. Division 103 CMR 420.07(4)(c) should be followed in reporting the results of the reclassification to the Commissioner.
(b) Emergency Cases. Where it is necessary to transfer an individual in order to place him in awaiting action status pending reclassification, the Superintendent shall obtain the approval of the Deputy Commissioner for Community Services.
(c) Outside Facilities (Contract Facilities). It is the responsibility of the Community Program Manager or the Contract Compliance Manager to contact the respective Department Classification Committee when the need arises. The contract facilities have responsibility to prepare a disciplinary and/or a progress report to adequately set forth the reasons of said request.
(d) The Departmental Community–Based Classification Committee is responsible for conducting an impartial hearing for reviewing the facts and circumstances, and for making appropriate recommendations regarding future placement.
103 CMR 420.07(7).

clared to be "consistent with applicable statutes, CMR's and Departmental policies." *See* Manual, section 2.1.

Section 4.5(b) of the Manual states that "Major or continuous violations of program standards may result in termination at the discretion of the Director, and/or the Associate Commissioner, or Duty Officer in non-business hours." The program standards whose violation may result in expulsion or other disciplinary action are specifically enumerated. They include: use or threat of physical violence, escape, possession or use of alcohol or drugs, failure to follow established check-in and phone-in procedures. *See* Program Standards, section E; Manual, section 4.4. In addition, section 4.5(a)(1) of the Manual requires the program director to issue a report containing the specific reasons for an inmate's transfer, a requirement which echoes a similar provision found in 103 CMR 420.07(7)(c).

These rules and procedures clearly indicate that an inmate's return to higher custody occurs as the result of a violation of one or more enumerated regulations. Moreover, the specified infractions warranting removal from the program are virtually the same as those found to convey a protected liberty interest in *Brennan*. 813 F.2d at 6–7. And, as in *Brennan*, an inmate's expectation under the Massachusetts scheme arises not only from the program rules but from a "community release agreement" and a "community release permit" signed by the inmate and program officials. These documents state that an inmate agrees to be bound by the program rules and that violations of the rules may result in disciplinary action or prosecution. Finally, both the Manual and the CMR's specifically provide for an "impartial hearing" by the DOC "for reviewing the facts and circumstances [of the termination], and for making appropriate recommendations regarding future placement." 103 CMR 420.07(7)(d); Manual, section 4.5(a)(7).

■ We find that the relevant provisions in the Manual and Program Standards constitute "particularized standards or criteria

guiding the State's decisionmakers." *Olim v. Wakinekona*, 461 U.S. 238, 249, 103 S.Ct. 1741, 1747, 75 L.Ed.2d 813 (1983); *Brennan v. Cunningham*, 813 F.2d at 7. Decisionmakers in Massachusetts, both in practice and by design, do not return inmates from halfway houses to higher custody "for any constitutionally permissible reason or for no reason at all."[7] Inmates such as Lanier, who are subject to the provisions of the Manual and Program Standards and have signed agreements indicating that their conduct will be regulated by the same, have a legitimate expectation that they will be returned only for violating the established program rules. Thus, having undertaken the kind of case-by-case analysis required by the Supreme Court in *Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 12, 99 S.Ct. 2100, 2106, 60 L.Ed.2d 668 (1979), we hold that appellant Lanier has established a protected liberty interest in remaining at Brooke House. We now turn to the question of whether the process granted Lanier was adequate.

### B. *The Process Due*

In *Brennan* we discussed the process due, under the fourteenth amendment of the Constitution, to an inmate being transferred from a halfway house to higher custody. After balancing the private and governmental interests involved, we found that a halfway house resident is entitled to more protection than that granted to a prisoner transferred from the general prison population to administrative segregation, *see Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), though less than that given to individuals whose parole has been revoked, *see Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). We determined that the interest of a halfway house resident is analogous to those discussed in *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), which concerned the revocation of good time credits.

---

**7.** This conclusion is borne out by the deposition of Dennis Humphrey, an Associate Commission-

er of Corrections (*see* Appendix at 509–10), as well as by stipulated facts 12 and 13.

*Wolff* established that three due process requirements be satisfied:

(1) advance written notice of the disciplinary charges, (2) an opportunity consistent with institutional safety to call witnesses and present evidence, and (3) a written statement by the factfinder of the evidence relied on and the reasons for the disciplinary action.

*See Wolff,* 418 U.S. at 563–67, 94 S.Ct. at 2978–80; *Brennan,* 813 F.2d at 9.

We find that Lanier was afforded adequate advance written notice of the charges against him. As the Supreme Court has stated, "consideration of what procedures due process may require must begin with the precise nature of the government function involved." *Morrissey v. Brewer,* 408 U.S. at 481, 92 S.Ct. at 2600. In this case, Lanier was given a disciplinary charge on May 8, 1984, the day of his removal from Brooke House. Although this charge listed only "being out of place" and omits mention of the other alleged infractions which eventually led to Lanier's termination from the program, it must be remembered that at the time of his removal in the early morning hours the appellant was suspected of escape. In *Brennan,* we suggested that the notice requirement could be tailored to meet an institution's security needs. *Brennan,* 813 F.2d at 9. Therefore, we cannot fault appellees for contemporaneously notifying Lanier only of the reason precipitating his immediate transfer. Furthermore, we find it significant that Lanier received notice of the additional allegations brought against him prior to his July 20th parole hearing and his August 8th reclassification hearing.[8]

Likewise, we find that the second *Wolff* requirement, an opportunity to call witnesses and to present evidence, was also satisfied. On August 8, 1984 Lanier was given

a reclassification hearing as a result of which it was decided that Lanier should remain in higher custody. Nowhere does Lanier dispute the adequacy of his representation at that hearing, the procedures followed therein,[9] or of the evidence relied on by the reclassification committee in reaching its decision. Instead, Lanier objects to the timeliness of this hearing, arguing that he was entitled to meet with the reclassification committee *prior* to his transfer from Brooke House, or in any event at a time earlier than three months following his removal.

▪ Contrary to these assertions, we find that appellant was not entitled to a hearing prior to his removal from the halfway house. The second *Wolff* requirement adopted in *Brennan* calls for a hearing opportunity "consistent with institutional safety...." 813 F.2d at 9. As discussed previously, Lanier, who had been convicted of several violent crimes, was returned to higher security under circumstances that indicated a possible escape attempt. We therefore hold that it was consistent with institutional safety that appellant be granted only a post-transfer hearing on his return to higher custody after the transfer took place.

▪ Nor do we find that appellant had a state-based due process right in receiving a hearing within a specified time such as we recognized in *Maldonado Santiago v. Velázquez García,* 821 F.2d 822 (1st Cir. 1987). There, we held that Puerto Rico prison officials violated a prisoner's due process rights by failing to hold a post-transfer hearing within seven days as required by a prison rule. *Id.* at 828, citing *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). Here, however, state regulations do not contemplate a specific timetable for receiving a reclassifica-

---

**8.** Lanier argues that he did not receive notification of the additional allegations of rule infractions until the day of his parole hearing. The record does not bear this out, however, and indicates that Lanier received notice of the additional allegations as part of his termination report from Brooke House. (App. at 228). Moreover, Lanier's student lawyer submitted a memorandum on his behalf at the July 20, 1984 parole hearing. Said memorandum responded to all of the allegations of rule infractions raised against appellant by the Parole Board. (App. at 183).

**9.** Such procedures are outlined at 103 CMR 420.13, and afford inmates the opportunity to present written and oral testimony on their own behalf.

tion hearing, but merely require that such hearings be held regularly "whenever any significant change should be made in the individual's program." 103 CMR 420.12. Lacking any specific statutory or regulatory directive, we cannot say that three months constitutes an unreasonably long delay so as to violate due process. *Cf. Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 2603–04, 33 L.Ed.2d 484 (1972) (two-month lapse in granting hearing on parole revocation not unreasonable).

Nevertheless, we find it potentially troublesome that appellant in this case did not receive a reclassification hearing until after his hearing before the Parole Board on the question of his reserve parole date. Our concern is in part due to "the close relationship of the work release program to the possibility of parole...." *Brennan v. Cunningham*, 813 F.2d at 9. Under the Massachusetts scheme, an inmate does not participate in a halfway house program unless he has been granted a reserve parole date set for three months from the time of transfer to lower custody. Likewise, the granting of parole is often tied to the successful completion of a halfway house program. As such, an inmate's return to higher custody might in theory, in and of itself, lead to the rescission of his reserve parole date; in turn, the reclassification committee might then deny a return to a halfway house setting on the ground that the inmate no longer has a reserve parole date of within three months and thus no longer qualifies for a halfway house program. To avoid such unfair bootstrapping it is probably preferable to conduct a reclassification hearing before the Parole Board hearing.

■ We need not decide this question here, however, because the record reveals that at the July 20, 1984 hearing the Parole Board considered the alleged rule infractions leading to Lanier's termination from the halfway house program and did not base its decision solely on the fact of appellant's return to higher custody. Appellant received notice of various rule infractions and was represented at the Parole Board hearing by a student lawyer who submitted a memorandum responding to the various allegations. After the hearing, the Parole Board issued a report indicating that it was basing its decision to rescind appellant's parole date on the charges listed in paragraph "2" of the notice. The "paragraph 2" charges included failure to make required call-ins, failure to arrive at Brooke House on time, making unauthorized withdrawals from appellant's checking account, and being out of place on three separate occasions. Because appellant had an opportunity to address each of these charges resulting in his removal from Brooke House at an appropriate time, we do not find that holding the reclassification hearing after the Parole Board hearing violated appellant's due process rights in this case.

Finally, the third *Wolff* requirement was met. As indicated earlier, the record reveals that appellant received written notification of the reasons that the reserve parole date was rescinded. Moreover, with regard to the August 8, 1984 reclassification hearing, 103 CMR 420.13 requires the Classification Board to submit a report detailing the reasons for any action taken. Appellant has nowhere alleged that those procedures were not followed.

■ For the above-stated reasons, we conclude that appellant was afforded due process with regard to his return to higher custody. Because we dispose of appellant's halfway house claim on these grounds, we need not address the district court's finding that the defendants were entitled to qualified immunity with respect to the halfway house claim. We turn now to Lanier's reserve parole date claim.

## III. THE RESERVE PAROLE DATE

Appellant also argues that he is entitled to damages based on the rescission of his reserve parole date of May 25, 1984. Specifically, Lanier claims 1) that he was entitled to a hearing before his reserve parole date was provisionally rescinded on May 31, 1984, and 2) that the final hearing held on July 20, 1984 did not comport with pro-

cedural and substantive due process requirements. The district court rejected Lanier's arguments, holding that no hearing was necessary because Lanier did not have a constitutionally protected liberty interest in his reserve parole date.

In reaching its conclusion, the district court relied on the Supreme Court's decision in *Jago v. Van Curen*, 454 U.S. 14, 102 S.Ct. 31, 70 L.Ed.2d 13 (1981) (per curiam). *Jago* concerned an Ohio prisoner who was granted a parole date only to have it revoked before his release without the benefit of notice and a hearing. The Supreme Court found that the prisoner had no protected liberty interest in his parole date and therefore no due process protections were required prior to rescission. Significantly, the Court found that neither the "grievous loss" admittedly suffered by the prisoner upon the revocation of his parole date nor the "mutually explicit understanding" that he was to be paroled, was sufficient to establish a liberty interest. *Id.*, 102 S.Ct. at 34. Perhaps most importantly, the Court found that parole for Ohio prisoners lies wholly within the discretion of the Ohio Adult Parole Authority, and that the pertinent Ohio statutes providing for parole do not in themselves create protected liberty interests for due process purposes. *Id.* at 34–36.

Appellant attempts to distinguish *Jago* by claiming that there Ohio law unambiguously granted the parole board of that state unbridled discretion to revoke the parole date up until the time of a prisoner's release. In contrast to the Ohio scheme, appellant argues that, under Massachusetts law, once a reserve parole date has been granted, the Parole Board's own deci-

sio.. aking procedures and guidelines explicitly limit the grounds for rescission.[10] In other words, appellant argues that the Parole Board's guidelines constitute a state law source for a liberty interest that did not exist under Ohio law as discussed in *Jago*.

Appellant draws support for this argument from the Second Circuit's decision in *Green v. McCall*, 822 F.2d 284 (2nd Cir. 1987) which reaffirmed its prior holding in *Drayton v. McCall*, 584 F.2d 1208 (2nd Cir.1978). In *Drayton*, the Second Circuit held that a federal prisoner who had been granted an early effective release date but who had not yet been released had a protected liberty interest. While the *Drayton* court did not question the discretion of the United States Parole Commission to set or deny a parole date in the first instance, it found that once that date had been set the Commission's own regulations limited its rescission authority to "two narrowly circumscribed" sets of factual circumstances:

> *First*, the Commission may reconsider its grant of parole when the grantee has been found guilty of *institutional misconduct* .... *Second*, reconsideration is authorized when *new information* adverse to the prisoner and unrelated to prison misconduct is discovered, 28 C.F.R. section 2.34(b), such as a prison[er]'s willful concealment or misrepresentation of information.

*Drayton v. McCall*, 584 F.2d at 1215 (emphasis added). The Court concluded that since the Commission, by its own regulations, had limited its own rescission authority to these two carefully defined categories, a prisoner who had been granted an early release date had a justifiable expecta-

---

**10.** Appellant does not contend that he has a liberty interest in being granted a reserve parole date in the first instance. Indeed, the relevant state statutes have been held not to convey a protected liberty interest in the granting of parole or in parole eligibility. *Commonwealth v. Hogan*, 17 Mass.App.Ct. 186, 191–92, 456 N.E.2d 1162, 1166 (1983). Specifically, G.L. c. 127 section 5, which defines the powers and duties of the Parole Board, places no substantive restrictions on the Board's decision-making role. Moreover, although G.L. c. 127 section 133 de-

fines when a prisoner becomes eligible for parole, there is no requirement that he must be eligible for parole at some time during his imprisonment. *Id.* Finally, it has been held repeatedly that Massachusetts "statutes and case law indicate that the granting of parole is within the discretion of the parole board." *Lanier v. Massachusetts Parole Board*, 396 Mass. 1018, 489 N.E.2d 670, (1986); *Guillemette v. Commonwealth*, 375 Mass. 543, 548, 377 N.E.2d 945, 949 (1978).

tion of achieving liberty on that date. Thus, that date could not be rescinded without due process. *Id.* at 1220.

In *Green,* decided in 1987, the Second Circuit reexamined its decision in *Drayton* in light of subsequent changes in the law that arguably had eroded *Drayton*'s authority. In spite of these alleged changes, the *Green* court reaffirmed its prior holding. First, it found that although the pertinent regulations limiting the Commission's rescission authority had been revised, the new regulations still restricted the Commission's discretion in substantially the same manner they had previously. *Green,* 822 F.2d at 287–88. Next, the *Green* court examined its holding in *Drayton* in light of the Supreme Court's decision in *Greenholtz v. Inmates of Nebraska Penal & Correctional Complex,* 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979), which held that the Nebraska parole statute gave prisoners a legitimate expectancy in the parole board's setting of a parole date because mandatory language in the statute provided that the board "shall" order the prisoner's release "unless" it be of the opinion that his release should be deferred. *See Green,* 822 F.2d at 288–89. The *Green* court concluded that the analytical framework of *Greenholtz* supports, rather than undermines, its conclusion in *Drayton* because the liberty interest of a parole grantee is, if anything, more substantial than that of the *Greenholtz* prisoners. *Id.* Finally, the court distinguished *Jago* for the same reason advanced by appellant herein —namely that in *Jago* Ohio law unambiguously grants that state's parole board the authority to rescind a parole date up until the time of a prisoner's release, whereas under the federal regulations scrutinized in *Green* the parole board's discretion to rescind had been limited. *Green,* 822 F.2d at 289–90.

Returning to the case at hand, we agree with appellant's argument that the scheme employed by the Massachusetts Parole Board more closely resembles that discussed in *Green,* rather than that found to

convey no liberty interest in *Jago.* Section 326.01 of the procedures promulgated by the Massachusetts Parole Board sets guidelines for when a reserve parole date may be provisionally rescinded. That section provides as follows:

(a) A provisional rescission, or withdrawing of a previously granted parole release date, occurs upon an office vote of a majority of the Board panel members who originally heard the case. If the case was heard by a Hearing Officer the rescission request is referred to the original Board Member(s) who decided on the case.

(b) Provisional rescission is precipitated by a report from the Institutional Parole Officer or other Parole staff member.

(c) There are several reasons for the Board to provisionally rescind a release date:

(1) *Misconduct by the inmate* which results in one or more disciplinary reports. This includes infractions of rules within the institution, on work release, or on furlough.

(2) *New court charges* resulting from misconduct not addressed by the institutional disciplinary board, for example, escape or assault on a correction officer.

(3) *Additional information,* such as the discovery of an outstanding warrant, which the Board was not aware of at the time of the hearing.

(4) Failure of inmate to meet the prescription of the Board, for example, failure to gain acceptance into a program, failure to gain acceptance into the Interstate Company, etc.

(Emphasis added).

Our reading of section 326.01 points to the conclusion that it establishes a more detailed set of criteria governing the rescission of a parole date than that found by the Second Circuit to convey a liberty interest in *Drayton* and *Green.* The first, second and third reasons listed under subsec-

tion (c) are an itemization of offenses falling under the two relatively broad categories—"institutional misconduct" and "new information"—found by the Second Circuit to warrant a liberty interest under the federal regulations. The inclusion of the fourth reason in section 326.01 only serves to further particularize the limits of the Parole Board's discretion under Massachusetts law.

We therefore hold that the appellant has established a liberty interest in his reserve parole date.[11] However, we need not reverse the district court's decision on this basis because we also hold that the defendants in this case were entitled to qualified immunity.

██ In granting defendants qualified immunity we rely on the well-known standard employed by the Supreme Court in *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). There, the Court held that to succeed under section 1983, a plaintiff must show that defendants violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* Failing this, defendants are immune from claims for money damages. In *Borucki v. Ryan,* 827 F.2d 836 (1st Cir.1987), we interpreted the test established in *Harlow* to mean the following:

> [I]n assessing a claim of qualified immunity, it is not sufficient for a court to ascertain in a general sense that the alleged right existed.... [A] court must determine whether an alleged right was established with sufficient particularity that a reasonable official could anticipate that his actions would violate that right.

*Borucki v. Ryan,* 827 F.2d at 838.

At the time appellant's reserve parole date was rescinded, no court had held that the laws or practices of Massachusetts created a protected liberty interest in a reserve parole date. In fact, *Drayton* is the only case we have found that had established such a right as of the time in question, and that case was based on an interpretation of federal parole regulations. Moreover, *Drayton*'s authority was at least temporarily called into question by the Supreme Court's decision in *Jago* issued in 1981. Although *Drayton* was eventually reaffirmed by the Second Circuit in *Green,* the latter decision was not issued until 1987, three years after the events giving rise to appellant's complaint. Given the above chronology, we cannot conclude that in 1984 a liberty interest in a reserve parole date "was established with sufficient particularity that a reasonable official could anticipate that his actions would violate that right." We therefore hold that defendants were entitled to qualified immunity with respect to Lanier's reserve parole date claim.[12]

██ Finally, we reject Lanier's substantive due process claim that the evidence adduced at his rescission hearing was insufficient to support the Parole Board's decision to rescind his reserve parole date. In reaching this conclusion we are mindful of the fact that the Parole Board grounded

---

11. Here we note that we are not bound by the decision in *Lanier v. Massachusetts Parole Board,* 396 Mass. 1018, 489 N.E.2d 670 (1986), in which the Supreme Judicial Court of Massachusetts vacated a preliminary injunction entered on Lanier's behalf, finding that Lanier had failed to show a probability of success on the merits of his due process claim. As the Supreme Court has indicated, whether state law, as construed by a state supreme court, creates a liberty interest protected by the fourteenth amendment is at bottom a federal question. *See Olim v. Wakinekona,* 461 U.S. 238, 244 n. 5, 103 S.Ct. 1741, 1744 n. 5, 75 L.Ed.2d 813 (1983); *Memphis Light, Gas & Water Division v. Craft,* 436 U.S. 1, 9, 98 S.Ct. 1554, 1560, 56 L.Ed.2d 30 (1978). In *Lanier,* the procedural posture did

not allow the court to rule directly on the existence of a liberty interest, and indeed the court found that "the extent to which [the reserve parole] date is binding" is not "an appropriate issue to resolve prior to the development of an adequate trial record." *Id.* We do not, therefore, read that case to stand for the proposition that section 326.01 places no restrictions on the State Parole Board in rescinding reserve parole dates.

12. Because we dispose of this issue on the grounds of qualified immunity, we need not address whether Lanier received whatever process he was due.

its decision in part on the May 8, 1984 "out-of-place" charge that had previously been dismissed at a June 14 disciplinary hearing. Aside from the May 8th incident, the Parole Board considered several other allegations, evidenced by appellant's termination report, of Lanier's rule infractions at Brooke House. In the memorandum submitted by appellant's student lawyer, these violations are largely admitted, although their significance is disputed. We therefore find that the Parole Board had sufficient evidence on which to base its decision. *Cf. Superintendent v. Hill,* 472 U.S. 445, 454, 105 S.Ct. 2768, 2773, 86 L.Ed.2d 356 (1985).

## IV. CONCLUSION

In sum, we hold that:

1) Appellant established a liberty interest in remaining at Brooke House but that the procedure he received following his transfer was adequate for due process purposes.

2) Although appellant established a liberty interest in his reserve parole date, his right to such was not clearly established at the time that date was rescinded, and therefore defendants are entitled to qualified immunity with respect to this part of appellant's claim.

3) The Parole Board's decision to rescind appellant's reserve parole date was based on sufficient evidence.

The judgment of the district court is *affirmed.*