UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT


No. 95-1466

JAMES DOMINIQUE,

Plaintiff, Appellant,

v.

WILLIAM WELD, ET AL.,

Defendants, Appellees.



APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge] 


Before

Boudin,* Circuit Judge, 

Campbell, Senior Circuit Judge, 

and Stahl, Circuit Judge. 


Wendy B. Golenbock, for appellant. 
Stephen G. Dietrick, Deputy General Counsel, with whom Nancy 
Ankers White, Special Assistant Attorney General, and Herbert C. 
Hanson, Senior Litigation Attorney, Massachusetts Department of 
Correction, were on brief for appellees.



January 18, 1996


 

*Judge Boudin heard oral argument in this matter but has not
participated in the issuance of the panel's opinion. The remaining
two panelists therefore issue this opinion pursuant to 28 U.S.C.
46(d).

CAMPBELL, Senior Circuit Judge. Plaintiff James 

Dominique, a sentenced inmate in the Massachusetts prison

system, was returned to confinement after he had been allowed

to participate in a work release program for almost four

years. He appeals from the district court's refusal to order

reinstatement of his work release status and its dismissal of

his related claims, brought under 42 U.S.C. 1983, alleging

violations of the Due Process Clause of the Fourteenth

Amendment and the Ex Post Facto Clause. We affirm, albeit

for different reasons in light of recent Supreme Court

decisions.

I. Facts I. Facts

Plaintiff was imprisoned in 1983 for multiple

crimes including incest and is scheduled for release in June

2000. In August 1987, he was transferred to the minimum

security Massachusetts Correctional Institution at Lancaster

("MCI-Lancaster"). In May 1988, the Superintendent of MCI-

Lancaster permitted him to renew his driver's license in

connection with work he was then doing on state vehicles. In

August 1990, plaintiff was approved for the Community Work

Release Program. He became a mechanic for R.M.J.

Transportation, Inc., and the following year was permitted to

open his own vehicle repair business. 

-2-

Plaintiff remained in good standing in the work

release program. However, in the summer of 1993, access to

his license and the keys to his personal vehicle was revoked,

causing him to lose his job at R.M.J. Transportation. In

April of 1994, he was removed from the work release program.

On May 5, 1994, because he was deemed a security risk, he was

transferred from MCI-Lancaster to a medium security facility,

MCI-Shirley. No hearing occurred before the latter transfer,

but reclassification hearings were subsequently held on June

13 and September 23, 1994. Each time, a committee majority

recommended plaintiff's transfer to a lower security

facility. The Commissioner overruled these recommendations.

Plaintiff remains at MCI-Shirley.

Defendants1 say that they revoked plaintiff's

privileges because he remains in denial of his crime (in

particular, the incest), and because he had too little

accountability at his repair business. They justify taking

away plaintiff's license because of revised DOC guidelines

providing that only inmates within six months of an approved

release date are eligible to use their licenses. They add

that his crime makes him a risk to the public safety, and

that, having been denied parole on three occasions, he is

 

1. The defendants are William Weld, Governor of
Massachusetts, Thomas Rapone, then-Commissioner of the
Department of Public Safety, Larry E. Dubois, Commissioner of
the Massachusetts Department of Correction, and Luis Spencer,
Superintendent of MCI-Lancaster.

-3-

more likely to attempt to escape. Plaintiff responds that he

has never violated any condition of the Community Release

Agreement ("Agreement").2 He claims that his removal

resulted from media and public uproar following an incident -

- wholly unrelated to him -- in which an MCI-Lancaster

escapee shot a police officer. Plaintiff was never given a

written statement of reasons for his removal. New

regulations concerning the treatment of sex offenders make

plaintiff presently ineligible for work release.

In his district court action, plaintiff alleged

that these changes in his status violated the Due Process

Clause of the Fourteenth Amendment and the Ex Post Facto

Clause. He requested a preliminary injunction ordering that

he be reinstated to the work release program. In dismissing

the due process claim, the district court held that plaintiff

had shown neither a constitutionally-derived nor a state-

 

2. The Community Release Agreement for Lancaster pre-
release programs requires a participating inmate to signify
his understanding that "[i]n accepting and participating in
community release programs including all furloughs, work
release, and education release opportunities, [he]
voluntarily accept[s] the following conditions . . . ." The
participant cannot leave the state, cannot leave his assigned
location during breaks unless authorized to do so, must be
aware of specific requirements and arrangements for each
specific release activity, must cooperate with requested
medical examinations or searches of lockers or outside work
areas, and must conduct himself generally "in accordance with
the laws of the state and community."
The Agreement states that "[a]ny violation of community
release policies will result in [the participant's] being
subject to disciplinary action or prosecution and will not be
considered in the future community participation requests."

-4-

created liberty interest. This being so, the Fourteenth

Amendment did not require the state to provide procedures

prior to removing him from the program and returning him to

prison. The district court also found no violation of the Ex

Post Facto Clause, because the new regulations governing

participation in work release were not punitive but rather

related to the public safety. The court denied injunctive

relief, as plaintiff had not shown a likelihood of success on

the merits.3 

II. Standard of Review II. Standard of Review

The district court dismissed plaintiff's claims in

response to defendants' motion in the alternative for

dismissal under Fed. R. Civ. P. 12(b)(6) or Fed. R. Civ. P.

56. The district court recited the standard governing

12(b)(6) motions to dismiss, but it relied in part on

materials outside of the pleadings (including the Agreement

and affidavits) to determine whether plaintiff enjoyed a

protected liberty interest entitling him to procedural due

process before removal from the work release program. We

 

3. The district court dismissed plaintiff's pendant state
law claims without prejudice, pursuant to 28 U.S.C.
1367(c)(3). While appellant's counsel claimed at oral
argument a lack of substantive as well as procedural due
process, the former theory is not briefed nor does it appear
to have been developed below. Accordingly, it was waived.
See Grella v. Salem Five Cent Sav. Bank, 42 F.3d 26, 36 (1st 
Cir. 1994). 

-5-

therefore treat the motion as one for summary judgment. See 

Smith v. Massachusetts Dep't of Correction, 936 F.2d 1390, 

1394 (1st Cir. 1991); Fed. R. Civ. P. 12(b)(6). We review a

grant of summary judgment de novo, viewing the facts in the 

light most favorable to the nonmovant, plaintiff. Coyne v. 

Taber Partners I, 53 F.3d 454, 457 (1st Cir. 1995). 

III. Due Process Clause of the Fourteenth Amendment III. Due Process Clause of the Fourteenth Amendment

A. The District Court Decision A. The District Court Decision

The Fourteenth Amendment provides that no state

shall "deprive any person of life, liberty, or property

without due process of law." U.S. Const. amend. XIV. The

focal issue here is whether plaintiff was deprived of a

protected liberty interest. Plaintiff has not asserted that

he possessed a liberty interest created by the federal

Constitution itself.4 Rather, he has contended that

 

4. The Supreme Court has recognized that, in certain
circumstances, the Constitution itself may give rise to a
liberty interest. See, e.g., Washington v. Harper, 494 U.S. 
210, 221-222 (1990) (involuntary administration of
antipsychotic drugs); Vitek v. Jones, 445 U.S. 480 (1980) 
(involuntary commitment to a mental hospital); Morrissey v. 
Brewer, 408 U.S. 471 (1972) (revocation of parole). 
Generally, prisoners under confinement do not have a
constitutionally-derived liberty interest. See, e.g., Hewitt 
v. Helms, 459 U.S. 460 (1983) (state action taken within 
sentence imposed); Meachum v. Fano, 427 U.S. 215 (1976) 
(transfer to higher security prison); Bowser v. Vose, 968 
F.2d 105, 106 (1st Cir. 1992) (denial of furlough); Lanier v. 
Fair, 876 F.2d 243, 246 (1989) (removal from halfway house 
program); Brennan v. Cunningham, 813 F.2d 1, 6 (1st Cir. 
1987) (same). 

-6-

Massachusetts state regulations and the Community Release

Agreement established a state-created liberty interest which

defendants could not take away without providing due process.

The regulations and Agreement, he argued, cabined officials'

discretion and led him legitimately to expect to remain in

the work release program so long as he did not violate some

express condition. Dominique relied on cases holding that a

liberty interest may be created by "explicitly mandatory

language" within state regulations. See Kentucky Dep't of 

Corrections v. Thompson, 490 U.S. 454, 463 (1989); Hewitt v. 

Helms, 459 U.S. 460, 471-472 (1983); see also Olim v. 

Wakinekona, 461 U.S. 238, 249 (1983) ("particularized 

standards or criteria [to] guide the State's decisionmakers")

(citation omitted). Dominique pointed to cases of this

circuit holding that a signed agreement outlining criteria

for participation in and removal from a prison release

program may evidence a state-created liberty interest.

Lanier v. Fair, 876 F.2d 243 (1st Cir. 1989); Brennan v. 

Cunningham, 813 F.2d 1 (1st Cir. 1987). 

 

The Tenth Circuit recently recognized a
constitutionally-derived liberty interest in a case involving
a state pre-parole conditional supervision program. See 
Harper v. Young, 64 F.3d 563, 566 (10th Cir. 1995) (citing 
Edwards v. Lockhart, 908 F.2d 299, 302-303 (8th Cir. 1990) 
for the proposition that parole and work release should be
viewed on a continuum, with the program at issue more closely
resembling parole because it allowed a convict "to exist,
albeit conditionally, in society on a full-time basis").

-7-

The district court analyzed the state regulations

and Agreement under Thompson, Hewitt, Olim criteria. It 

concluded that the language relating to Dominique's interest

in participating and remaining in the work release program

was too provisional to create a constitutionally-protected

liberty interest. Neither the regulations nor the Agreement

required officials to grant work release status initially or

indefinitely. Despite certain similarities between

plaintiff's Agreement and agreements in Brennan and Lanier, 

the district court determined that, under our latest

precedent, language of a more mandatory character was

essential.5 

Plaintiff appealed. Within a week of filing his

appellate brief, the Supreme Court issued its opinion in

Sandin v. Conner, infra, modifying the standard for 

determining the existence of a state-created liberty

interest. 

 

5. See Bowser v. Vose, 968 F.2d 105, 108 (1st Cir. 1992) (a 
regulation providing that "[a] resident who satisfies one of
the [six enumerated] purposes . . . shall be eligible for
furlough" was insufficient to create a liberty interest, for
"[a]bsent from the regulations . . . is any mandatory
language directing that a furlough must be granted to any 
inmate who satisfies the eligibility requirements"); Rodi v. 
Ventetuolo, 941 F.2d 22, 25 (1st Cir. 1991) (clearly 
mandatory regulatory language placed definite substantive
limits on officials' actions, as state conceded); Smith, 936 
F.2d at 1397 (court reserved judgment on the inmate contract
because of a misconduct-based violation, but noted a lack of
mandatory language limiting discretion in both the contract
and the regulations).

-8-

B. Sandin v. Conner Sandin v. Conner 

In Sandin v. Conner, 115 S. Ct. 2293 (1995) (5-4), 

the Court criticized its former precedent under which courts

examined the language in state statutes and regulations to

determine whether a liberty interest was created. This

doctrine "encouraged prisoners to comb regulations in search

of mandatory language on which to base entitlements to

various state-conferred privileges." Id. at 2299. The Court 

expressed two policy concerns: its prior approach "creates

disincentives for States to codify prison management

procedures in the interest of uniform treatment." Id. The 

old approach also "has led to the involvement of federal

courts in the day-to-day management of prisons," contrary to

cases affording state officials appropriate deference and

flexibility in prison management. Id. 

The Court held that states may still create liberty

interests that afford prisoners due process protections, but

explained:

[T]hese interests will be generally
limited to freedom from restraint which,
while not exceeding the sentence in such
an unexpected manner as to give rise to
protection by the Due Process Clause of
its own force . . . , nonetheless imposes
atypical and significant hardship on the 
inmate in relation to the ordinary 
incidents of prison life.  

Id. at 2300 (internal citations omitted) (emphasis supplied). 

Applying this standard to the situation in Sandin, the Court 

-9-

concluded that disciplining a prisoner for thirty days in

segregated confinement "did not present the type of atypical,

significant deprivation in which a state might conceivably

create a liberty interest." Id. at 2301. 

C. Applying Sandin C. Applying Sandin 

Defendants argue that Sandin requires this court to 

affirm the district court's dismissal of plaintiff's due

process claim. They agree with the lower court that the

language of the regulations and Agreement was insufficient to

create a liberty interest in any event, but argue that

removal from work release and return to regular confinement

did not meet Sandin's new threshold criterion of an "atypical 

and significant hardship . . . in relation to the ordinary

incidents of prison life." Id. at 2300. If solitary 

confinement for thirty days did not, in Sandin, rise to the 

level of an "atypical, significant hardship," then surely

removal from work release does not do so, defendants say. 

Plaintiff replies that Sandin is unclear about the 

extent to which the standard for recognizing liberty

interests has changed. He argues that the Due Process Clause

still protects inmates against important deprivations, and

that removal from work release and transfer to a higher

security prison constitute an "atypical and significant

hardship." 

-10-

We have some sympathy for plaintiff's complaint.

His removal from a work release program in which he was

apparently functioning well, and his transfer to a medium

security facility, may well, from his perspective, seem

unjust. But the federal courts are not authorized by law to

second-guess the policies of prison administrators in a

general sense. The question assigned to us is whether

plaintiff had a liberty interest in remaining in work release

status, such that under the Fourteenth Amendment he was

entitled to due process of law before that privilege could be

revoked. We are constrained to agree with defendants that

the new threshold test articulated in Sandin precludes our 

finding a liberty interest and bars relief.6 

As in Sandin, the state's action here did not in any way 

affect the duration of Dominique's state sentence. See id. 

at 2301-2302. Additionally, his transfer to a more secure

facility subjected him to conditions no different from those

ordinarily experienced by large numbers of other inmates

serving their sentences in customary fashion. In Sandin, the 

Supreme Court observed that conditions in the segregated

confinement at issue "mirrored those conditions imposed upon

inmates in administrative segregation and protective

 

6. Sandin applies retroactively to the present case, the 
Supreme Court having applied the rule announced in Sandin to 
the parties in that case. See Rivers v. Roadway Express, 
Inc., 114 S. Ct. 1510, 1519 (1994); Harper v. Virginia Dep't 
of Taxation, 113 S. Ct. 2510, 2517 (1993). 

-11-

custody." Id. at 2301 (footnote omitted). The Court found 

support in this similarity for the proposition that "[b]ased

on a comparison between inmates inside and outside

disciplinary segregation, the State's actions in placing him

there for 30 days did not work a major disruption in his

environment." Id. (footnote omitted). Similarly here, any 

hardship was not "atypical" in relation to the ordinary

incidents of prison life.

It is true that there is a considerable difference

between the freedoms Dominique enjoyed when he was in work

release status and the conditions of incarceration at a

medium security facility. To return from the quasi-freedom

of work release to the regimentation of life within four

walls may be said, relatively speaking, to have been a

"significant" deprivation. Nonetheless, confinement within

four walls of the type plaintiff now endures is an "ordinary

incident of prison life." It is not "atypical." The Court

has noted that an inmate's subjective expectations are not 

dispositive of the liberty-interest analysis. See id., 115 

S.Ct. at 2301 n.9.

If Dominique's contrary argument were to prevail,

we would open the door to finding an "atypical...restraint"

whenever an inmate is moved from one situation to a

significantly harsher one that is, nonetheless, a commonplace

aspect of prison existence. For example, a liberty interest

-12-

could be claimed if an inmate were moved into less agreeable

surroundings than his initial placement. Similarly, a

liberty interest might be claimed whenever authorities or the

state legislature decided to eliminate or cut back work

release programs or furloughs. Such changes, painful to

those affected, could be regarded under plaintiff's argument

as implicating liberty interests even though the prisoner was

never placed in conditions going beyond the customary rigors

of prison life. Such an outcome, we believe, would directly

conflict with Sandin's teachings. Sandin's new standard was 

expressly adopted by a majority of the Supreme Court "to

afford appropriate deference and flexibility to state

officials trying to manage a volatile environment." Id. at 

2299. The Court plainly intended to eliminate the basis for

federal due process claims stemming from internal transfers

and status changes that do not result in "atypical hardship,"

i.e., hardship beyond the norms of ordinary prison life. 

Hence the state's removal of Dominique's measure of freedom,

replacing it with confinement of a sort commonly associated

with ordinary prison life, did not violate anything that can

be termed a liberty interest. See Klos v. Haskell, 48 F.3d 

81 (2d Cir. 1995) (a pre-Sandin case denying relief on 

strikingly similar facts, cited with apparent approval in

Sandin, 115 S. Ct. at 2299-2300). 

-13-

Plaintiff urges that execution of the Agreement

shows that a matter sufficiently important to give rise to a

liberty interest is at stake. Prison officials, it is said,

do not enter into agreements with inmates concerning the

ordinary incidents of prison life. As the district court

found, however, the Agreement preserved broad decisionmaking

authority of state officials and the regulations did not

impose any duty to retain plaintiff in the work release

program. And, that analysis aside, withdrawal of work

release privileges did not meet Sandin's threshold test of 

working a "significant and atypical hardship in relation to

the ordinary incidents of prison life." While we may regret

the disappointment and frustration inherent in such

withdrawal, the hardship was not "atypical." Cf. Bulger v. 

United States Bureau of Prisons, 65 F.3d 48, 49-50 (5th Cir. 

1995) (inmate terminated from a prison job permitting the

automatic accrual of good-time credits lacked a protected

liberty interest, despite apparent violation of a state

regulation); see also Mitchell v. Dupnik, 67 F.3d 216, 221 

(9th Cir. 1995) (inmate lacked a protected liberty interest,

despite corrections officer's violation of prison

regulations); Orellana v. Kyle, 65 F.3d 29, 32 (5th Cir.) 

("the ambit of [prisoners'] potential Fourteenth Amendment

due process liberty claims has been dramatically narrowed" by

-14-

Sandin), petition for cert. filed, (U.S. Sep. 15, 1995) (No. 

95-6743).

Under the standard announced in Sandin, we hold 

that plaintiff's loss of work release privileges did not

affect any state-created liberty interest of his, hence did

not violate the Due Process Clause.7 

IV. Ex Post Facto Clause IV. Ex Post Facto Clause

Plaintiff asserts a violation of the Ex Post Facto

Clause based on a new state regulation governing the

treatment and movement of sex offenders from commitment to

release. See 103 DOC 446.8 The regulation became 

 

7. The inmate in Sandin based his claim to a protected 
liberty interest on state regulations alone, and not on any
written agreement with the state, as is also present here.
The parties have not argued that Sandin is inapplicable for 
this reason. This court's prior relevant cases have applied
a language-focused approach to the state scheme as a whole,
whether or not an agreement was involved. See, e.g., Rodi, 
941 F.2d at 26 ("Our own precedents similarly teach that the
appropriate [Thompson/Hewitt] constitutional analysis looks 
beyond the State's statutes to administrative rules,
regulations, contractual commitments, and the like.");
Lanier, 876 F.2d at 248. 

8. The Sex Offender Treatment policy applies to inmates
serving a sentence for or convicted in the past of a sex
offense, or serving a sentence for a non-sexual offense where
"[t]here are sexual overtones in the reading of the official
version of a crime for which the inmate may have been charged
and sentenced." 103 DOC 446.08. The policy's expressed
goal is "to create a system in which there is a continuum of
service from the time an inmate with such a background is
committed, until he/she is released to the community, and
hopefully beyond." Id. 446.07.  
The policy requires identified sex offenders to complete
a four-phase treatment program at a medium security facility

-15-

effective in October 1994, at which time plaintiff was

incarcerated at the medium security facility to which he had

been transferred following his removal from work release

earlier that year. Plaintiff does not dispute the

Commonwealth's contention that under the regulation, he is

presently ineligible to participate in the work release

program. While the district court did not articulate a basis

for this ineligibility (instead assuming that was so),

plaintiff appears to be an identified sex offender who may

not be moved to a minimum security facility, with associated

privileges, unless and until he successfully completes a

treatment program, admits his offense, and otherwise obtains

approval for a transfer. See id. 446.07, 446.08(4), 

446.13. 

The district court rejected plaintiff's claim that

the regulation amounted to punishment applied retroactively

to plaintiff's offense. The court reasoned that the

regulation was "driven by safety concerns, and not by a

 

as a precondition for transfer. It outlines further
transition phases and evaluation processes as well. Transfer
appears ultimately possible absent "program failures,"
defined to include inmates who remain in denial of their
offense, those who "refuse to participate or minimize with
regard to their offense(s)," and those at the non-secure
facility treatment phase who move toward relapse or otherwise
become "at risk." Id. 446.13. The regulations also 
contain a sex offender "notice of release" provision, which
is not at issue in this appeal. See id. 446.14. 

-16-

desire to impose further punishment on prisoners." We

affirm, again guided by a recent Supreme Court decision.9

The Ex Post Facto Clause provides that "No State

shall . . . pass any . . . ex post facto Law." U.S. Const.

art. I 10. Ex post facto laws include "'every law that

changes the punishment, and inflicts a greater punishment,

than the law annexed to the crime, when committed.'" Miller 

v. Florida, 482 U.S. 423, 429 (1987) (quoting Calder v. Bull, 

3 U.S. (Dall.) 386, 390 (1798)). 

Defendants have not argued that the new regulation

is not a "law" for ex post facto purposes. There is some

disagreement among the circuits on this matter. Cf. Bailey 

v. Noot, 503 U.S. 952, cert.denied, (1992) (White, J., 

dissenting) (noting circuit split on whether Clause applies

to revised state parole regulations).10 In past cases we

 

9. Plaintiff's ex post facto claim is not barred by our
above ruling that he lacks a protected liberty interest. As
the Supreme Court has stated, "Evaluating whether a right has
vested is important for claims under the Contracts or Due
Process Clauses, which solely protect pre-existing
entitlements . . . . The presence or absence of an
affirmative, enforceable right is not relevant, however, to
the ex post facto prohibition. . . ." Weaver v. Graham, 450 
U.S. 24, 29-30 (1981); Jones v. Georgia State Bd. of Pardons 
& Paroles, 59 F.3d 1145, 1148 n.6 (11th Cir. 1995).  

10. The dispute appears to turn on whether a rule is
legislative (based on a delegation of statutory authority) or
merely interpretive, and whether a legislative rule is
binding or merely guides the exercise of discretionary power.
See, e.g., Jones, 59 F.3d at 1149 n.8 (applying Clause to 
state parole rules and comparing cases); Kellogg v. 
Shoemaker, 46 F.3d 503, 509 (6th Cir.) (applying Clause to 
binding parole regulations), cert. denied, 116 S. Ct. 120 

-17-

have applied the Clause to the federal Sentencing Guidelines,

see, e.g., United States v. Harotunian, 920 F.2d 1040, 1041- 

1042 (1st Cir. 1990), and rules issued by a state agency, see 

Martel v. Fridovich, 14 F.3d 1, 3 (1st Cir. 1993) 

(Massachusetts Department of Mental Health). We need not

address the possible limits of these holdings, for the

parties have not raised the issue and we find that no

violation occurred, even assuming arguendo that the Clause

applies to the regulation at issue. Accord Hamm v. Latessa, 

Nos. 94-2018, 94-1999, slip op. at 21 & n.14 (1st Cir. Dec.

27, 1995) (declining to decide whether a parole eligibility

policy was a "law" for ex post facto purposes).

The Supreme Court has reiterated recently that the

proper focus of ex post facto inquiry is whether the relevant

change "alters the definition of criminal conduct or

increases the penalty by which a crime is punishable." 

California Dep't of Corrections v. Morales, 115 S. Ct. 1597, 

1602 n.3 (1995) (emphasis supplied); see also Collins v. 

Youngblood, 497 U.S. 37, 43 (1990) (citing Calder, 3 U.S. 

(Dall.) at 391-392). Morales examined a California statutory 

amendment which authorized the Board of Prison Terms to defer

 

(1995) and 116 S. Ct. 274 (1995); Francis v. Fox, 838 F.2d 
1147, 1149-1150 (11th Cir. 1988) (holding that state work
release regulation was not an ex post facto "law"); Faruq v. 
Herndon, 831 F. Supp. 1262, 1279-1280 (D. Md. 1993) (holding 
that work release and security classification regulations
were not ex post facto "laws"), aff'd, Briscoe v. Herndon, 56 
F.3d 60 (4th Cir. 1995).

-18-

for up to three years parole suitability hearings for

multiple murderers. The Court found no ex post facto

violation, because the amendment "create[d] only the most

speculative and attenuated possibility of producing the

prohibited effect of increasing the measure of punishment for

covered crimes." Morales, 115 S. Ct. at 1603. The Court did 

not develop a precise formula; rather, it said, these

judgments "must be a matter of 'degree.'" Id. (internal 

citation omitted). It stated, however, that a change that

"simply 'alters the method to be followed' in fixing a parole

release date under identical substantive standards," but does

not change the applicable sentencing range, was insufficient.

Id. at 1602 (internal citation omitted); cf. Miller v. 

Florida, 482 U.S. 423 (1987) (violation found where statutory 

amendment increased presumptive sentencing range for certain

sexual offenses and permitted departure only for "clear and

convincing reasons"); Weaver v. Graham, 450 U.S. 24 (1981) 

(violation found where the statute retroactively reduced

"gain time" credits to prisoners, thereby eliminating the

lower end of the possible range of prison terms).

The question here, as in Morales, is whether the 

instant regulation "increases the penalty by which a crime is

punishable." Morales, 115 S. Ct. at 1602 n.3. It can be 

argued that the regulation increases the penalty because it

subjects Dominique to a different and stricter prison regime:

-19-

unless and until he successfully completes the prescribed

treatment program and admits to a crime he continually has

denied, he must remain confined at no less than a medium

security facility and remain ineligible for privileges

associated with lower security imprisonment. We conclude,

however, that this change in the conditions determining the

nature of his confinement while serving his sentence was an

allowed alteration in the prevailing "legal regime" rather

than an "increased penalty" for ex post facto purposes. See 

id. at 1603 n.6; cf. In re Medley, 134 U.S. 160 (1890) 

(discussing extreme penalty of solitary confinement and

finding an ex post facto violation where a new statute

required a prisoner to serve four weeks in complete isolation

before being executed at a time unknown to him); see also 

Ewell v. Murray, 11 F.3d 482, 487 (4th Cir. 1993), cert. 

denied, 114 S. Ct. 2112 (1994) (finding that a new regulation 

punishing a prisoner's refusal to submit to a DNA test by a

loss of good-time credits and possible isolated placement for

up to 15 days was not an ex post facto violation but was

"reasonably within the administrative structure of prison

authority that attends every sentence"). 

The change does not affect the length of

Dominique's sentence or his parole options. Cf. Morales, 115 

S. Ct. at 1603 & n.6 (emphasizing speculative effect on

prisoner's actual term of confinement, and stating that the

-20-

ex post facto clause does not "require that the sentence be

carried out under the identical legal regime that previously

prevailed"); Hamm, slip op. at 28 (finding no ex post facto 

violation where a revised parole policy which postponed a

prisoner's initial parole hearing presented a speculative

risk of extending his sentence). Compare Vargas v. Pataki, 

899 F. Supp. 96, 99 (N.D.N.Y. 1995) (statutory amendment

making an applicant for work release no longer eligible was

not an ex post facto violation) with Knox v. Lanham, 895 F. 

Supp. 750, 758 (D.Md. 1995) (change in security

classification and work release policies violated the ex post

facto clause where they "directly impact[ed] upon [lifers']

actual eligibility for parole"). 

While the matter is perhaps close, we conclude that

plaintiff has not satisfied his burden of showing an

increased penalty for his crime. See Morales, 115 S. Ct. at 

1602 n.3 (challenging party has "ultimate burden of

establishing that the measure of punishment itself has

changed"). The regulation appears primarily to affect the

methods followed to treat certain sex offenders for a period

of time, e.g., with regard to facility placement and 

treatment programs. The Ex Post Facto Clause does not

encourage close scrutiny by the federal courts of ongoing

procedural or operational changes in prisons to coordinate

-21-

treatment, promote security, and protect the public safety.

See id. at 1603; Martel, 14 F.3d at 2. 

Affirmed. 

-22-