Stephen Gerard RODI, Plaintiff,
Appellant,

v.

Donald R. VENTETUOLO, et al.,
Defendants, Appellees.

No. 90–1092.

United States Court of Appeals,
First Circuit.

Heard June 6, 1991.

Decided Aug. 5, 1991.

Lynette Labinger, by appointment of the Court, with whom Roney & Labinger, Elizabeth Colt, Providence, R.I., and Robert S. Powers were on brief, East Greenwich, R.I., for plaintiff, appellant.

Anthony A. Cipriano, Deputy Chief, Legal Services, Rhode Island Dept. of Corrections, Providence, R.I., for defendants, appellees.

Before SELYA and CYR, Circuit Judges, and STAHL,* District Judge.

SELYA, Circuit Judge.

The Rhode Island Department of Corrections (DOC) has in force regulations governing disciplinary and classification procedures, familiarly known as the "Morris Rules." This appeal requires us to consider whether the "Emergency or Temporary Provisions" of the Morris Rules (which we excerpt as an appendix and hereafter refer to as the "Emergency Provisions"), where applicable, imbue prison inmates with a liberty interest in remaining in the general prison population. We answer that question in the affirmative.

## I. BACKGROUND

In this case, appellant Stephen Gerard Rodi, an inmate at Rhode Island's state penitentiary, the Adult Correctional Institu-

tions (ACI), sued three prison officials.[1] Because Rodi appeared pro se, we read his complaint with an extra degree of solicitude. *See, e.g., Estelle v. Gamble*, 429 U.S. 97, 99, 97 S.Ct. 285, 288, 50 L.Ed.2d 251 (1976); *Ferranti v. Moran*, 618 F.2d 888, 890 (1st Cir.1980). And because the complaint was dismissed for failure to state a claim, we take as true all its factbound allegations and draw every reasonable inference in favor of the pleader. *See Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 16 (1st Cir.1989). We set the stage by describing in decurtate fashion the provenance of the Morris Rules, the facts undergirding Rodi's case, and the case's travel.

### A

The Morris Rules were promulgated in consequence of a consent decree entered by the United States District Court for the District of Rhode Island. That decree, dated April 20, 1972, memorialized the settlement of a class action brought by denizens of the ACI. The class comprised, essentially, all inmates then *in situ* and all future inmates. The litigation has been much chronicled, *e.g., Morris v. Travisono*, 310 F.Supp. 857 (D.R.I.1970) (*Morris I*); *Morris v. Travisono*, 373 F.Supp. 177 (D.R.I.1974) (*Morris II*), aff'd, 509 F.2d 1358 (1st Cir.1975) (*Morris III*), and we refer the reader who thirsts for detail to those opinions. The current text of the rules is reproduced in *Morris v. Travisono*, 499 F.Supp. 149, 161–74 (D.R.I.1980) (*Morris IV*).

### B

On August 16, 1987, a fracas erupted in the yard of the ACI's maximum security facility. Rodi claims that, although he remained in the kitchen throughout the disturbance, he nonetheless was shifted to the

---

1. The defendants, appellees here, were sued in both their individual and official capacities. They include Donald R. Ventetuolo, a DOC assistant director; James F. Berard, a former supervisor of the ACI's maximum security unit;

and Ronald F. Brodeur, a correctional officer. Inasmuch as the defendants have made no effort at individuation based on their divergent contributions to Rodi's disgruntlement, we do not distinguish among them for purposes of this opinion (sometimes referring to them collectively as "the State").

segregation unit later that same evening. According to Rodi, this transfer was ordered by Ventetuolo. Neither Ventetuolo nor any other prison official informed him why he was being moved or gave him an opportunity to present his side of the story. Rodi further claimed that, during roll call the next morning, correctional officers were told, falsely, that he had been "running around crazy with a twelve (12) inch kitchen knife."

On August 25, 1987, nine days after his transfer, appellant filed a request for resolution of grievance form protesting his reassignment to, and confinement in, segregation without notice or hearing. On the following day, he was interviewed by a DOC staffer. On August 27, the plot thickened; appellant says that defendant Berard ordered a correctional officer to "fabricate" a disciplinary report tying Rodi to the events of August 16. Four days later, all inmates implicated in the August 16 disturbance, including the appellant, were returned to maximum security.

### C

Invoking 42 U.S.C. § 1983 and seeking injunctive relief, a declaratory judgment, and money damages, Rodi filed suit in the federal district court on February 1, 1988. He alleged that the defendants violated his rights to due process and equal protection of the law by transferring him to administrative segregation without cause, notice, or an opportunity to be heard,[2] and by later returning him to maximum security "in a willful and calculated attempt to cause him bodily harm" (presumably at the hands of persons who mistakenly believed that he had been involved in the August 16 disturbance). The complaint also alleged that the defendants flouted the final judgment entered in *Morris II* by denying Rodi a review of his temporary assignment within one week of its accomplishment; violated the eighth amendment by subjecting him to

harassment and "r[iding] roughshod" over his liberty interests; and violated 18 U.S.C. §§ 241 and 242 by conspiring to deprive him of his constitutional rights.

The defendants filed a motion to dismiss under Fed.R.Civ.P. 12(b)(6). On January 11, 1990, a magistrate judge, presiding by mutual consent, *see* 28 U.S.C. § 636(c), dismissed plaintiff's complaint, concluding that it failed to state a claim upon which relief might be granted. After Rodi filed a timeous notice of appeal, we appointed counsel, entertained briefing, and heard oral argument. We now decide that the Emergency Provisions sufficed to create a cognizable liberty interest and that, contrary to the magistrate's ruling, the complaint set forth an actionable claim for due process violations. Since we also believe that the individual defendants are shielded by qualified immunity, we hold that the appellant is entitled only to declaratory relief and not to damages.

### II. ANALYSIS

In *Kentucky Dept. of Corrections v. Thompson*, 490 U.S. 454, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989), a case where prison inmates unsuccessfully challenged state correctional regulations as violative of the fourteenth amendment, the Supreme Court formulated the analysis and principles which govern the core claim advanced by the appellant:

> We examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient. The types of interests that constitute "liberty" and "property" for Fourteenth Amendment purposes are not unlimited; the interest must rise to more than "an abstract need or desire" and

---

**2.** The plaintiff's precise claim is that he was placed in "administrative segregation" in the punitive segregation unit. We, like the parties, read this as a claim that administrative, rather than disciplinary, segregation was imposed. The distinction is an important one, since "the

procedural due process requirements which attend administrative confinement are considerably less formal than those which attend disciplinary segregation." *Domegan v. Fair*, 859 F.2d 1059, 1064 n. 4 (1st Cir.1988).

must be based on more than "a unilateral hope." Rather, an individual claiming a protected interest must have a legitimate claim of entitlement to it.

*Id.* 109 S.Ct. at 1908 (citations omitted). Hence, we inquire whether plaintiff's complaint revealed a protected liberty interest in remaining in the general prison population and if so, whether, in being transferred to administrative segregation, plaintiff arguably received less than the process that was constitutionally due.

## A

It is well established that inmates do not have a right under the Constitution itself to remain in the general prison population or to be free from administrative segregation. *See Hewitt v. Helms,* 459 U.S. 460, 467–68, 103 S.Ct. 864, 869, 74 L.Ed.2d 675 (1983); *Meachum v. Fano,* 427 U.S. 215, 225, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976). Thus, Rodi's entitlement *vel non* to a protected liberty interest in respect to such matters hinges on whether an enforceable interest has been created by the State.

The Court has held that "a State creates a protected liberty interest by placing substantive limitations on official discretion." *Olim v. Wakinekona,* 461 U.S. 238, 249, 103 S.Ct. 1741, 1747, 75 L.Ed.2d 813 (1983). In the correctional context, laws and regulations have been found to limit discretion when the State thereby establishes "substantive predicates" governing official decisionmaking while simultaneously employing " 'explicitly mandatory language,' *i.e.,* specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow." *Thompson,* 109 S.Ct. at 1909–10.

In a situation where prison regulations mandated that certain procedures "shall," "will," or "must" be followed and that administrative segregation would not come to

pass "absent specified substantive predicates" such as "the need for control" or "the threat of serious disturbance," the Court has ruled "that the repeated use of explicitly mandatory language in connection with requiring specific substantive predicates demands a conclusion that the State has created a protected liberty interest." *Hewitt,* 459 U.S. at 471–72, 103 S.Ct. at 871. Applying the *Hewitt* indicia, we have discerned that liberty interests were inherent in regulations governing the transfer and segregation of inmates in Massachusetts, *Parenti v. Ponte,* 727 F.2d 21, 25 (1st Cir.1984), and in Puerto Rico, *Maldonado Santiago v. Velazquez Garcia,* 821 F.2d 822, 827 (1st Cir.1987). *See also Stokes v. Fair,* 795 F.2d 235, 238 (1st Cir. 1986) (correctional regulations held to create liberty interest in initiation and continuance of "awaiting action" status).

Here, a lengthy exegesis is unwarranted. Although the magistrate, relying on *Hechavarria v. Quick,* 670 F.Supp. 456 (D.R.I.1987),[3] opined that the Emergency Provisions did not create a liberty interest, the State forthrightly conceded at oral argument in this court that the language, structure, and context of the Emergency Provisions, taken at face value, fully satisfies the applicable *Thompson/Hewitt* criteria. We agree. The preface, as well as numbered Articles I and II of the provisions, place definite substantive limitations on the availability of temporary reassignment. The Morris Rules expressly state that transfers can occur only "[w]hen [officials are] faced with an immediate threat to the security or safety of the [ACI] or any of its employees or inmates" and when one of several specifically enumerated conditions exists. In turn, Articles III, IV, and V of the Emergency Provisions establish mandatory procedures as a necessary concomitant to temporary reassignment, requiring, among other things, written notice

---

3. In *Hechavarria,* the district court held that the Morris Rules, overall, did not endow inmates with a liberty interest in any particular classification within the institution. *See* 670 F.Supp. at 458–59. No further proceedings in *Hechavarria* are reported. There was, however, an appeal. In a per curiam disposition issued not for publication on October 4, 1988, we vacated the judg-

ment and remanded for consideration, inter alia, of whether the Emergency Provisions of the Morris Rules might create an enforceable liberty interest. Presumably because our opinion was unpublished and for some unexplained reason was not noted in the summary tables periodically appearing in the Federal Reporter, the magistrate was unaware of it.

to the inmate, compilation of a record, scrutiny of the record by high-echelon ACI officials, issuance of their report, and a more formal review by the Classification Board within one week following the reassignment. The repeated use of such unmistakably mandatory terms as "will" and "shall" in these paragraphs suffices to meet the Court's standard. *See Thompson,* 109 S.Ct. at 1910; *Hewitt,* 459 U.S. at 471–72, 103 S.Ct. at 871.

## B

While conceding that the language, structure, and context of the Emergency Provisions would ordinarily fulfill the prerequisites for creation of a liberty interest, the State argues that its situation is considerably out of the ordinary. The Morris Rules, being "court-created, not state-created," are in the defendants' view some strange hybrid that "cannot rightfully be construed as State law." Appellees' Brief at 7–8. This is so, the State reasons, since constitutionally protected liberty interests can only "arise from two sources—the Due Process Clause itself and the laws of the State," *Thompson,* 109 S.Ct. at 1908, *quoting Hewitt,* 459 U.S. at 466, 103 S.Ct. at 868, and the Morris Rules do not bear either set of genetic markings. Because they were spawned as part of a judicial decree, involuntarily entered, and cannot be changed or modified without application to the federal district court, *see Morris III,* 509 F.2d at 1361–62, the appellees claim that the Morris Rules lack the essential quality of "state legislative sanction," Appellees' Brief at 7, and thus are incapable of producing a cognizable liberty interest. We find this argument to be little more than an heuristic.

First, nothing in the Supreme Court's opinions suggests a basis for limiting the "state law" root from which a constitutionally protected interest may grow to direct legislative enactments. Indeed, the Court itself has gone past the artificial line which Rhode Island seeks to draw and has scrutinized less formally promulgated provisions to determine whether a State has conferred a liberty interest on a prison inmate. *See Thompson,* 109 S.Ct. at 1906–07 & nn. 1, 2 (provisions examined included those contained in the State's compendium of corrections policies as well as in a so-called "Reformatory Procedures Memorandum"); *Hewitt,* 459 U.S. at 470–71 & n. 6, 103 S.Ct. at 871 & n. 6 (provisions examined included an administrative directive). Our own precedents similarly teach that the appropriate constitutional analysis looks beyond the State's statutes to administrative rules, regulations, contractual commitments, and the like. *See, e.g., Smith v. Massachusetts DOC,* 936 F.2d 1390, 1396–97 (1st Cir.1991) (inmate's classification contract can be considered in respect to his liberty interest claim); *Lanier v. Fair,* 876 F.2d 243, 248 (1st Cir.1989) (inmate's community release agreement can be considered); *Maldonado Santiago,* 821 F.2d at 825 (disciplinary rules issued by director of corrections can be considered); *Stokes,* 795 F.2d at 237 (DOC regulations can be considered).

Second, like the regulations at issue in *Maldonado Santiago, Stokes,* and *Parenti,* 727 F.2d 21, the Morris Rules were promulgated under specific authority delegated by state statute. In 1970, as agreed in an interim consent decree, the Morris Rules were initially issued by the official responsible for managing the ACI, acting under authority of R.I.Gen.Laws § 13-1-2 (1956; repealed) to promulgate "lawful and necessary rules in regulations." *See Morris I,* 310 F.Supp. at 863.[4] In the final consent decree, entered on

---

4. Under the bureaucratic structure obtaining in 1970, oversight of Rhode Island's prison system was vested in the Rhode Island Department of Social Welfare, and more particularly, in the department's assistant director for correctional services. It was that official who promulgated the first version of the Morris Rules. In 1972, the DOC was created and supervision of the ACI was transferred to it. The director of the DOC was given authority by statute to:

Make and promulgate necessary rules and regulations incident to the exercise of his or her powers and the performance of his or her duties including but not limited to rules and regulations regarding ... safety, discipline, ... classification, ... care, and custody for all persons committed to correctional facilities. R.I.Gen.Laws § 42–56–10(v) (1988).

April 20, 1972, the State agreed to promulgate the rules pursuant to the Rhode Island Administrative Procedures Act (APA), R.I.Gen.Laws §§ 42–35–1 to 42–35–18. That circumstance materialized on October 10, 1972. *See Morris III*, 509 F.2d at 1359; *Morris II*, 373 F.Supp. at 179. The Morris Rules have remained in full force and effect since that time.[5]

In our view, this history leaves no doubt that the regulations have the necessary state legislative sanction. Because the Morris Rules were promulgated pursuant to specifically conferred legislative authorization, they are legislative rules which, under Rhode Island's own jurisprudence, have the force and effect of law. *See, e.g., Great American Nursing Centers, Inc. v. Norberg*, 567 A.2d 354, 356–57 (R.I.1989) ("Legislative rules are promulgated pursuant to the specific statutory authority provided by the Legislature.... [and] a legislative rule has the force and effect of law.").

■ Third, the fact that the Morris Rules were promulgated in consequence of a consent decree lacks decretory significance. A court cannot enter a consent decree to which one party has not consented. *See United States v. Ward Baking Co.*, 376 U.S. 327, 334, 84 S.Ct. 763, 768, 11 L.Ed.2d 743 (1964). Thus, the looming presence of a consent decree does not make the rules court-created rather than state-created in any meaningful sense, for "the voluntary nature of a consent decree is its most fundamental characteristic." *Local No. 93, International Assn. of Firefighters, Etc. v. Cleveland*, 478 U.S. 501, 521–22, 106 S.Ct. 3063, 3075, 92 L.Ed.2d 405 (1986). Nor does the fact that the rules cannot be modified without application to a federal judge make them any less volitional; that condition, after all, was freely agreed to by the State as part and parcel of the consent decree.

■ Rhode Island's position, we think, misconceives the fundamental nature of a consent decree. By definition, such decrees are not imposed *ab extra* by judicial fiat, but are entered into through the exercise of considered choice, typically after hard bargaining and with a full appreciation of the benefits achieved and the burdens assumed. By foregoing bitter-end litigation, the parties save time, defray expense, and shield themselves from the risks of utter defeat—abandoning, in the bargain, the spoils of outright victory. "Naturally, the agreement reached normally embodies a compromise," *United States v. Armour & Co.*, 402 U.S. 673, 681, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971), within the limits of which the litigants, absent either subsequent agreement or exceptional circumstances not present here, must be prepared to live. That the terms of a consent decree prove to be more onerous, or less advantageous, than a litigant originally surmised is not a basis for disclaiming the voluntariness of the agreement which led to the decree's birth.

The history of the Morris Rules reflects just such a process: the inmates agreed to drop their class action against prison officials and abandon their damage claims in exchange for the State's agreement to institute, and thereafter abide by, the Morris Rules. That agreement "serve[d] as the source of the court's authority to enter any judgment at all." *Local No. 93*, 478 U.S. at 522, 106 S.Ct. at 3075. Since "it is the agreement of the parties ... that creates the obligations embodied in the consent decree," *id.*, it is fanciful to speak of those obligations as "involuntary" or "court-created." Having willingly, if unenthusiastically, negotiated an end to adversarial litigation and thereby fathered the Morris Rules, the State cannot now disinherit the obligations which those rules impose by the simple expedient of claiming that the court

---

5. The State has occasionally tried to squirm loose from the constraints of the Morris Rules. In 1973, the State suspended the rules without leave of the district court, but we found the suspension to be invalid. *See Morris III*, 509

F.2d at 1362. In 1980, prison officials moved to vacate the original consent decree and lift enforcement of the rules. The district court denied the motion. *See Morris IV*, 499 F.Supp. at 157.

created the Morris Rules by a sort of immaculate conception.[6]

■ Finally, and further indicative of the insupportability of Rhode Island's position, is the fact that consent decrees have traditionally been considered the functional equivalent of contracts, *see id.* at 519, 106 S.Ct. at 3073 ("because their terms are arrived at through mutual agreement of the parties, consent decrees ... closely resemble contracts"), and are regularly interpreted as if they were contracts, *see Langton v. Johnston,* 928 F.2d 1206, 1220–21 (1st Cir.1991). An ordinary agreement or contract between the State and an inmate can create a protectible liberty interest. *See, e.g., Smith v. Massachusetts DOC,* 936 F.2d at 1396–97 (classification contract can bottom liberty interest claim); *Lanier,* 876 F.2d at 248 (community release agreement held to establish enforceable liberty interest); *cf. Collins v. Marina–Martinez,* 894 F.2d 474, 476–78 (1st Cir.1990) (promise of university tenure establishes constitutionally protectible property interest). That being so, we think it would be passing strange if a consent decree, which possesses all the attributes of an ordinary contract plus the additional element of judicial approbation, were to be accorded some inferior status. In our view, the Morris Rules, as an agreement voluntarily entered into between the State and a class of inmates, is no less capable of conferring a protectible liberty interest on a prison inmate than a piece of paper signed by the inmate and a DOC official.

### C

■ Having concluded that the Emergency Provisions of the Morris Rules endowed inmates at the ACI, Rodi included, with a liberty interest in remaining in the general prison population, we turn next to the question of what process was due.

In *Hewitt,* the Court held that, at a minimum, an inmate placed in administrative segregation should be provided with "an informal, nonadversary review of the information supporting [the inmate's] administrative confinement, including whatever statement [the inmate may wish] to submit, within a reasonable time after confining him to administrative segregation." 459 U.S. at 477, 103 S.Ct. at 874. The Court stressed that the process due in such a situation was not elaborate:

> An inmate must merely receive some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation. Ordinarily a written statement by the inmate will accomplish this purpose, although prison administrators may find it more useful to permit oral presentations in cases where they believe a written statement would be ineffective. So long as this occurs, and the decisionmaker reviews the charges and then-available evidence against the prisoner, the Due Process Clause is satisfied.

*Id.* at 476, 103 S.Ct. at 874 (footnote omitted); *see also Parenti,* 727 F.2d at 25. While the *Hewitt* Court regarded as constitutionally sound procedures whereby an inmate received notice of the charges against him within one day of his alleged misconduct and a hearing within five days of his transfer, it eschewed any attempt to craft an inflexible time line. *See Hewitt,* 459 U.S. at 477, 103 S.Ct. at 874. The Court announced, instead, the more general standard that the opportunity to be heard "must occur within a reasonable time following an inmate's transfer, taking into account the relatively insubstantial private interest at stake and the traditionally broad discretion of prison officials." *Id.* at 476 n. 8, 103 S.Ct. at 874 n. 8.

---

6. In *Thompson,* where regulations promulgated pursuant to a consent decree were also at issue, the Court noted, but did not resolve, the question of "whether a consent decree can create a liberty interest protected by the Fourteenth Amendment." 109 S.Ct. at 1911 n. 5. The *Thompson* Court was able to skirt the question because it found the regulations to be discretionary in nature. *Id.* 109 S.Ct. at 1910–11. Here, because the consent decree required the promulgation of the regulations under the APA, thereby explicitly according them the imprimatur of state law, we, too, may avoid the precise question on which the *Thompson* Court reserved decision.

It is beyond serious question that the procedures set forth in the Emergency Provisions of the Morris Rules are facially adequate to satisfy the relatively minimal due process requirements which must attend the transfer of a prisoner to administrative segregation. Article III's mandate that inmates receive written notice "as soon as reasonably possible" conforms to *Hewitt*'s notice requirements and temporal guidelines. Similarly, the oversight requirement is satisfied by Article V's mandate that all transfers must be reviewed by the Classification Board within one week and be finalized "without unnecessary delay." And, although these provisions do not expressly mention inmates being given a chance to present their side of the story to the Classification Board, Article III of the Emergency Provisions states that, in addition to written notice, inmates "will be afforded all other rights due them under institution [sic] disciplinary and classification procedures." We deem this incorporation by reference adequate to fulfill the "opportunity to be heard" requirement, as the stipulated regimen in classification proceedings entails that an inmate "shall have the right to present all pertinent information to the Board." Morris Rules "Classification Procedures," § C.6, *reprinted in Morris IV,* 499 F.Supp. at 167.

### D

While the State's procedures are, on paper, constitutionally sufficient, Rodi's complaint alleges that, when his difficulties arose, the procedures were swept under the rug. He claims that he never received any formal notice, written or oral, indicating why he was being transferred; that it was only after he had filed a grievance, and no fewer than ten days after being placed in administrative segregation, that he spoke with any prison official concerning his move; and that, although he remained in segregation for a total of sixteen days, the Classification Board never met to review his assignment. These well-pleaded "facts" must, of course, be taken as true at this stage of the proceedings. *See Dartmouth Review,* 889 F.2d at 16.

We held in *Maldonado Santiago* that, where a State sets a specific timetable for a post-transfer hearing as part of a series of regulations sufficient to give rise to a liberty interest, mere tardiness in providing such a hearing can constitute a violation of a convict's due process rights. *Maldonado Santiago,* 821 F.2d at 828;[7] *see also Smith v. Massachusetts DOC,* 936 F.2d at 1397 n. 11 (discussing difference between purely procedural time limits and time limits impacting on liberty interests). Here, the prison officials were more than tardy. Despite the fact that the Morris Rules explicitly required the Classification Board to review all transfers within a week, plaintiff spent more than twice that amount of time in administrative segregation without being given any opportunity to be heard. This allegation alone is sufficient to state a claim for deprivation of procedural due process.

### E

■ Having concluded that the Emergency Provisions of the Morris Rules do create an enforceable liberty interest in remaining in the general prison population and that plaintiff's complaint sufficiently alleges an abridgement of this liberty interest, we turn last to the question of whether the defendants may be held personally liable for damages.[8]

---

7. In *Maldonado Santiago,* where the applicable rule required that the inmate receive a hearing within seven working days of an emergency transfer, the plaintiff's hearing was not held until the ninth business day (the fifteenth calendar day) after her transfer. 821 F.2d at 825–26 & nn. 3, 4. Despite the relatively brief period of delay, we ruled that the lateness of her hearing amounted to a deprivation of procedural due process. *Id.* at 828.

8. For purposes of this analysis, we need not distinguish among the various theories pleaded by the plaintiff in his complaint, *see supra* Part I(C), as they are all dependent, in one way or another, on the existence of the liberty interest which we have described and, hence, intersect at the same junction with the doctrine of qualified immunity. Nor need we wax longiloquent concerning the plaintiff's attempts to plead an eighth amendment violation or to invoke 18 U.S.C. §§ 241, 242. As to the former argument,

We start with bedrock. "[G]overnment officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Thus, our concern at this juncture necessarily shifts from a consideration of the plaintiff's rights to a consideration of the defendants' entitlements. As we have written:

> Because qualified immunity does not address the substantive viability of a section 1983 claim, but rather the objective reasonableness of a defendant's actions, a plaintiff who is entitled to prevail on the merits is not necessarily entitled to prevail on the issue of qualified immunity.

*Amsden v. Moran*, 904 F.2d 748, 751–52 (1st Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 713, 112 L.Ed.2d 702 (1991); *accord Collins*, 894 F.2d at 478. Government officials retain their right to qualified immunity so long as they "could reasonably have believed that their actions were lawful, given preexisting law and the information that they possessed." *Martin v. Marriner*, 904 F.2d 120, 121 (1st Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 696, 112 L.Ed.2d 686 (1991). The test of whether a right was "clearly established" at a particular time is an objective one:

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

Rodi's complaint falls far short of stating any actionable claim under the eighth amendment. *See, e.g., Wilson v. Seiter*, —— U.S. ——, ——, 111 S.Ct. 2321, 2327, 115 L.Ed.2d 271 (1991) (to transgress the eighth amendment in a prison context, the offending conduct must constitute

*Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987) (citation omitted).

Applying this test demands that we look at the liberty interest created by the Emergency Provisions of the Morris Rules with a "historical perspective." *Amsden*, 904 F.2d at 752. Doing so reveals that the basic premise of *Hewitt*—that a State can create a protected liberty interest in the location of an inmate's confinement and his subsequent transfer—was well established when Rodi's cause of action accrued. *Hewitt* "reaffirmed a case line of at least seven years' duration." *Maldonado Santiago*, 821 F.2d at 830–31. By 1987, when Rodi's transfer took place, that precedential array was still solidly in place.

Although the case line was long, however, its configuration remained tenebrous in many respects, a reality that the Court itself has acknowledged. *See Thompson*, 109 S.Ct. at 1909–10. Sometimes the State was found to have created a protected liberty interest anent prisoner transfers, *e.g., Hewitt*, 459 U.S. at 470–71, 103 S.Ct. at 870–71, and other times the State was found not to have done so, *e.g., Olim*, 461 U.S. at 249–50, 103 S.Ct. at 1747–48; *Meachum*, 427 U.S. at 228–29, 96 S.Ct. at 2540. Simply put, history demonstrates this to have remained an evolving and indefinite area of the law, at least until *Thompson* was decided in 1989, with the signposts establishing the doctrine of state-created liberty interests evident enough, but nonetheless pointing down a cloudy and crooked path.

Further adding to the murkiness of the picture were the Morris Rules themselves. Though promulgated in 1972, they were repeatedly contested by state officials, *see supra* note 5, and, up to the present moment, have never been specifically or explicitly declared by any court as creating an enforceable liberty interest in remaining in the general prison population. Perhaps

"deliberate indifference" to the inmate's rights). As to the latter argument, the statutes which Rodi cites do not give rise to a civil action for damages. *See Cok v. Cosentino*, 876 F.2d 1, 2 (1st Cir.1989) (per curiam).

most significant is that the federal district court, virtually on the heels of Rodi's transfer, decided on September 29, 1987, that the Morris Rules did not endow Rhode Island prisoners with a liberty interest protected by the fourteenth amendment. *See Hechavarria,* 670 F.Supp. at 459. Under such opaque circumstances, it mocks reality to assert that, in the summer of 1987, the contours of the right at issue were sufficiently luminous that the unlawfulness of the defendants' actions should have been apparent.

We conclude, therefore, that responsible prison officials, in mid–1987, could reasonably have thought, given the then-current state of the law, that the Morris Rules in general, and the Emergency Provisions in particular, did not create a cognizable liberty interest triggering due process safeguards and, therefore, that noncompliance with the procedures outlined therein would not infract prisoners' constitutional rights. Hence, the defendants are shielded from the appellant's damage claims by the doctrine of qualified immunity.

## IV. CONCLUSION

To recapitulate, we hold (1) that the Emergency Provisions of the Morris Rules did endow the plaintiff with a protected liberty interest in remaining in the general prison population, (2) that the allegations of his complaint were, therefore, sufficient to withstand the defendants' Rule 12(b)(6) motion, but (3) that because the liberty interest was not clearly established in mid–1987, the defendants were entitled to the benefit of their qualified immunity. Seen in this light, remitting the case for trial would serve no useful purpose.[9] Instead, we va-

cate the dismissal and remand to the district court (specifically, to the district judge to whom the suit was originally assigned) for the entry of appropriate orders declaring the existence of the described liberty interest, exonerating the defendants in respect to money damages, and dismissing the claim for injunctive relief as moot (the appellant having long since been returned to his original placement). The district court is free, of course, to take such other action, consistent with this opinion, as it may deem desirable.

■ Since the plaintiff has prevailed on appeal in respect to a significant issue in the litigation, we hold here and now, in harmony with a practice which we have employed selectively in the past, that the plaintiff is entitled to reasonable counsel fees and costs incurred in the prosecution of this appeal. *See, e.g., Aubin v. Fudala,* 821 F.2d 45, 47 (1st Cir.1987) and cases cited therein; *see also* 42 U.S.C. § 1988; 1st Cir.Loc.R. 39.2. We direct the district court, on remand, to determine the amounts to be awarded.

*So Ordered.*

## APPENDIX

### EMERGENCY OR TEMPORARY PROVISIONS

When faced with an immediate threat to the security or safety of the Adult Correctional Institutions or any of its employees or inmates, officials of the institution may temporarily reassign inmates in accordance with the following regulations.

I. Reassignment by a correctional officer on approval of his immediate supervisor:

9. On appeal, Rodi urges that he has stated an actionable claim for retaliation. We disagree. Plaintiff's complaint does not plead such a cause of action, since it does not "aver a chronology of events which may be read as providing some support for an inference of retaliation." *McDonald v. Hall,* 610 F.2d 16, 18 (1st Cir.1979). To be sure, the plaintiff did refer to retaliation in a subsequently filed affidavit. Nevertheless, this affidavit was inapposite in regard to a Rule 12(b)(6) motion to dismiss. *See Gilbert v. Cambridge,* 932 F.2d 51, 60 n. 11 (1st Cir.1991). More important, we find that, even under the generous standard applicable to pro se plain-

tiffs, adding the affidavit to the record still would not enable plaintiff to satisfy the pleading requirements set forth in *McDonald.* By the same token, we find no merit in the plaintiff's challenges to the way the magistrate handled his case. As we have noted before, there is nothing amiss simply because a judge assumes an active role in attempting to expedite a case. *See United States v. Devin,* 918 F.2d 280, 294–95 (1st Cir.1990); *Aggarwal v. Ponce School of Medicine,* 837 F.2d 17, 22 (1st Cir.1988). Stripped of pejoratives, none of the plaintiff's allegations casts any doubt on the fairness of the proceedings before the magistrate.

**32**

A. When a correctional or other employee witnesses an inmate commit a serious wrongdoing.

B. When an inmate presents reasonable eye witness information that an inmate committed a serious wrongdoing.

C. When an inmate seeks safety or protection from others.

II. By supervisory officials of rank of Lieutenant or above, pending investigation.

A. When an inmate is suspected of serious wrongdoing, either committed or planned.

B. When an inmate is suspected of being a witness to overt acts which constitute a serious violation of institution regulations or a violation of state law.

C. When requested by prosecuting attorney or superintendent of State Police.

1. When inmate is suspected perpetrator of a crime.

2. When inmate is a material witness to a criminal act.

Request under C will be honored upon oral request but shall not be observed beyond seventy-two (72) hours in absence of receipt by Assistant Director of a written confirmation by requesting authority.

III. All inmates assigned temporarily under the preceding provisions will, as soon as reasonably possible, be informed in writing of the reason for their assignment and will be afforded all other rights due them under institution disciplinary and classification procedures.

IV. A written record of all temporary reassignments shall be forwarded to the Associate Director for his concurrence or nonconcurrence, and he shall forward the record to the Assistant Director or his designee for approval or disapproval. The report showing review of each is to be placed in the inmate's permanent classification file.

V. All temporary assignments shall be reviewed at the next regular meeting of the Classification Board, which in any case will not exceed one week, and final action by the Board will be ordered without unnecessary delay.