**James DOMINIQUE, Plaintiff,**

v.

**William WELD, Thomas Rapone, Larry E. Dubois, and Luis Spencer, Defendants.**

**Civ. A. No. 94–40105–NMG.**

United States District Court, D. Massachusetts.

March 31, 1995.

Wendy B. Golenbock, Wayland, MA, for plaintiff.

Stephen G. Dietrick, Mass. Dept. of Corrections, Boston, MA, for William Weld, Thomas Rapone, Larry E. Dubois, Luis Spencer.

Leo Paul Landry, Millbury, MA, pro se.

David MacNevin, Shirley, MA, pro se.

Roger Murphy, Shirley, MA, pro se.

## MEMORANDUM AND ORDER

GORTON, District Judge.

Pending before the Court is a motion of plaintiff, James Dominique, pursuant to Fed.R.Civ.P. 65, for a preliminary injunction. Plaintiff, an inmate in the Massachusetts prison system, seeks an order allowing him to resume his participation in the work release program pending resolution of this case.

Also pending before this Court is a motion by the defendants, William Weld, Thomas Rapone, Larry E. Dubois, and Luis Spencer, (collectively "the defendants") pursuant to Fed.R.Civ.P. 12(b)(6) and/or Fed.R.Civ.P. 56, to dismiss the case.

## I. FACTUAL BACKGROUND

Plaintiff is a state prisoner who has been removed from the Massachusetts work-release program at MCI–Lancaster. In the complaint, plaintiff asserts that the defendants have deprived him of his Fourteenth Amendment right to Due Process in violation of 42 U.S.C. § 1983, and have also violated his rights under the Massachusetts Civil Rights Act ("MCRA"), M.G.L. c. 12 §§ 11H–11J. Dominique claims that the defendants did not provide him with due process when they terminated his participation in the work

release program. Defendants respond that state rules and regulations do not grant plaintiff a liberty interest in remaining in the work release program, and therefore, due process is not required.

Plaintiff is currently serving an aggregate sentence of 16½ to 25 years for assault by means of a dangerous weapon, carrying a firearm without authority, malicious damage to personal property, kidnapping, unlawful distribution of a Class B controlled substance, possession of a Class A controlled substance, and incest. Plaintiff was imprisoned in March, 1983, and was transferred to the minimum security facility of MCI–Lancaster in August, 1987. At MCI–Lancaster, plaintiff initially maintained vehicles belonging to the Department of Corrections, and in or about May, 1988, the Superintendent of MCI–Lancaster, Paul Dickhart, allowed plaintiff to renew his driver's license in order to road test state vehicles. In August, 1990, Dominique was approved for the "Community Work Release Program" and obtained a job as a mechanic for R.M.J. Transportation, Inc. In May, 1991, Dickhart authorized Dominique to open his own auto and truck repair business in Leominster, Massachusetts.

During the following two years, Dominique worked both jobs uneventfully. In July or August, 1993, plaintiff was told to surrender his license and the keys to his personal vehicle, which caused him to lose his job at R.M.J. Transportation. Defendants assert that Dominique's license was revoked pursuant to new Department of Corrections guidelines. Plaintiff contends that there is no such written policy, and that his license was suspended pursuant to verbal orders given over the telephone. Plaintiff alleges that Correctional Counselor Michael Kelley told him, "You did nothing wrong. The Superintendent is pulling all of the licenses and motor vehicles of the inmates due to public and media pressure."

Dominique continued to work at his auto repair shop in Leominster until April, 1994, when he was told not to go to work, and was subsequently removed from the Community Work Release Program. Plaintiff contends that he was removed from work release because of public pressure created in March, 1994, when an escapee from MCI–Lancaster, Robert Stewart, shot a police officer. Defendants state that Dominique was removed from the program because his position lacked accountability, and Department of Corrections officials viewed it as inconsistent with public safety for plaintiff (who has been convicted of incest and remains in denial of his crime) to be employed in a family business. Dominique states that he was never provided with a written statement of reasons for his removal from the program.

On May 5, 1994, plaintiff was transferred from MCI–Lancaster to MCI–Shirley, a medium security facility. Since the transfer, plaintiff has received reclassification hearings on June 13 and September 23, 1994. Following each of these hearings, the reclassification committee recommended that plaintiff be transferred to minimum security, however, those recommendations were overruled by the Commissioner.[1] The defendants state that transferring plaintiff to a lower security facility would be inappropriate because plaintiff remains in denial of his crimes.

In support of the motion for a preliminary injunction which would return Dominique to the work release program, his wife/business partner states that she is unable to run the auto repair garage without Dominique's assistance. Plaintiff claims that his business is in debt and will fail soon if he is not returned to work release.

On March 1, 1995, this Court heard oral argument on plaintiff's motion for a preliminary injunction, and also on the merits of defendants' motion to dismiss.

---

1. The plaintiff submits as exhibits to his affidavit, two forms labeled "Summary/Key Issues," which list the issues considered by the review/reclassification committee, and the committee's recommendations. On the form dated 6/13/94, the committee recommends Dominique be transferred to MCI–Lancaster (pre-release), and the superintendent approved the recommendation on 7/26/94. The line on which the Commissioner must sign his approval or disapproval is blank, but the Court assumes that the Commissioner denied the committee's recommendation, because plaintiff remained in the medium security facility at MCI–Shirley after that hearing.

## II. LEGAL ANALYSIS

### A. *Standard Governing 12(b)(6) Motions.*

In ruling on a motion to dismiss, Fed.R.Civ.P. 12(b)(6) requires the Court to accept "the factual averments contained in the complaint as true, indulging every reasonable inference helpful to the plaintiff's cause." *Garita Hotel Ltd. Partnership v. Ponce Fed. Bank, F.S.B.,* 958 F.2d 15, 17 (1st Cir.1992). On a motion to dismiss, civil rights claims are subject only to normal standards of pleading. *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* — U.S. —, —, 113 S.Ct. 1160, 1163, 122 L.Ed.2d 517 (1993). The Court is required to look only to the allegations of the complaint, and "if under any theory they are sufficient to state a cause of action in accordance with the law, a motion to dismiss the complaint must be denied." *Knight v. Mills,* 836 F.2d 659 (1st Cir.1987). Furthermore, the Court notes that pleadings filed by *pro se* plaintiffs are held to a somewhat less stringent standard than those drafted by lawyers. *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972); *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976).[2]

### B. *Section 1983 Claim.*

With respect to plaintiff's Section 1983 claim, the parties agree that a dispositive issue is whether plaintiff was entitled to Due Process protections when he was transferred out of the state created community work release program. In *Kentucky Dept. of Corrections v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 1908, 104 L.Ed.2d 506 (1989), the Supreme Court described the analysis to be followed when considering such a due process claim:

> We examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient. The

types of interests that constitute "liberty" and "property" for Fourteenth Amendment purposes are not unlimited; the interest must rise to more than "an abstract need or desire" and must be based on more than "a unilateral hope." Rather, an individual claiming a protected interest must have a legitimate claim of entitlement to it. (citations omitted). *Id.* at 460, 109 S.Ct. at 1908.

In the case at bar, Dominique claims that he has a protected liberty interest in remaining in the work release program as long as he does not violate program rules.

It is well-settled that "[a] liberty interest protected by the Fourteenth Amendment may arise from two sources—the Due Process Clause itself and the laws of the States." *Hewitt v. Helms,* 459 U.S. 460, 466, 103 S.Ct. 864, 868, 74 L.Ed.2d 675 (1983). The Court will consider those sources separately.

#### 1. *Liberty Interests Derived from the Due Process Clause.*

When a prisoner is still under confinement, the Supreme Court has consistently held that:

> "As long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight."

*Hewitt v. Helms,* 459 U.S. 460, 468, 103 S.Ct. 864, 869, 74 L.Ed.2d 675 (1983), *quoting Montanye v. Haymes,* 427 U.S. 236, 242, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976).

Whether a prisoner has a constitutionally-derived liberty interest in maintaining his current conditions depends on the amount of freedom those conditions allow. The Supreme Court has held that there is no independent, constitutional liberty interest in cases concerning decisions to grant a prisoner parole, or in cases concerning good time credits. *See Hewitt,* 459 U.S. at 467–68, 103

---

**2.** While plaintiff originally filed his complaint *pro se,* he has since retained counsel. Plaintiff's counsel has filed memoranda in support of the

motion for a preliminary injunction and in opposition to defendants' motion to dismiss.

S.Ct. at 869–70; *Greenholtz v. Nebraska Penal Inmates,* 442 U.S. 1, 7, 99 S.Ct. 2100, 2103–04, 60 L.Ed.2d 668 (1979); *Wolff v. McDonnell,* 418 U.S. 539, 557, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974). However, the Court has found independent, constitutional liberty interests to exist where total release from institutional life has been revoked, or where the restrictions imposed go beyond the original conditions of confinement. *See Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (revocation of parole); *Vitek v. Jones,* 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980) (transfer to mental hospital).

In *Brennan v. Cunningham,* 813 F.2d 1 (1st Cir.1987) and *Lanier v. Fair,* 876 F.2d 243 (1st Cir.1989), the First Circuit considered cases of prisoners living in halfway houses. In holding that there was no constitutionally derived liberty interest in remaining in a halfway house, the Court noted that:

> [a]n inmate in a halfway house is granted a measure of liberty that lies between that of a parolee and that of an inmate incarcerated in prison. While the prisoner in this situation enjoys some significant liberty, he remains under confinement in a correctional institution. His position is, therefore, not like that of a parolee.

*Brennan,* 813 F.2d at 5, *citing Garcia v. DeBatista,* 642 F.2d 11, 14 (1st Cir.1981), and *Whitehorn v. Harrelson,* 758 F.2d 1416 (11th Cir.1985) (where the Eleventh Circuit held that there is no independent constitutional liberty interest in remaining in a work release program.)

▪ Under the MCI–Lancaster work release program, Dominique lived at the minimum security prison and was allowed to leave the prison facility in order to go to his place of work. The Court finds that 1) this work release program granted Dominique some freedom, but not the broad freedoms granted to a parolee and 2) the Dominique work release program is similar to the programs considered in *Brennan* and *Lanier,* in terms of the amount of freedom granted to the inmate, and therefore Dominique has no constitutionally-derived liberty interest in continuing in this work release program. Consequently, if a liberty interest exists, it

must arise from state statutes, regulations, or practices. *Brennan,* 813 F.2d at 6; *Lanier,* 876 F.2d at 246 (1st Cir.1989).

**2. *Liberty Interests Derived from State Law.***

▪ In order to establish a liberty interest derived from state law, a prisoner must show:

> that particularized standards or criteria guide the State's decisionmakers. If the decisionmaker is not required to base its decisions on objective and defined criteria, but instead can deny the requested relief for any constitutionally permissible reason or for no reason at all, ... the State has not created a constitutionally protected liberty interest.

*Olim v. Wakinekona,* 461 U.S. 238, 249, 103 S.Ct. 1741, 1747, 75 L.Ed.2d 813 (1983) (citations omitted). Furthermore, a liberty interest is created only if "the regulations contain 'explicitly mandatory language,' i.e., specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow." *Kentucky Dept. of Corrections v. Thompson,* 490 U.S. 454, 463, 109 S.Ct. 1904, 1910, 104 L.Ed.2d 506 (1989).

In *Thompson,* the Supreme Court considered prison regulations concerning the admission or exclusion of visitors to Kentucky prisons. The regulations stated that:

> Certain visitors who are either a threat to the security or order of the institution or nonconducive to the successful re-entry of the inmate to the community may be excluded. These are, but not restricted to [reasons A through F]. *Id.* at 456 n. 1, 109 S.Ct. at 1906 n. 1.

The Court found that the Kentucky regulations and procedures did provide "substantive predicates" to guide the decisionmaker's discretion, but concluded that:

> [t]he regulations at issue here ... lack the requisite relevant mandatory language. They stop short of requiring that a particular result is to be reached upon a finding that the substantive predicates are met.... The overall effect of the regulations is not such that an inmate can rea-

sonably form an objective expectation that a visit would necessarily be allowed absent the occurrence of one of the listed conditions. Or, to state it differently, the regulations are not worded in such a way that an inmate could reasonably expect to enforce them against the prison officials. *Thompson,* 490 U.S. at 464–65, 109 S.Ct. at 1910–11.

Plaintiff contends that *Brennan* and *Lanier* are analogous to this case, and that the Court should find that the current Massachusetts work release program regulations and the community release agreement signed by Dominique and prison officials, support a state-created liberty interest in remaining in the program. The government counters that the current regulations do not contain the relevant mandatory language required to satisfy the *Thompson* test, and therefore cannot support a state-created liberty interest.

 For reasons discussed below, the Court holds that neither the regulations nor the community release agreement at issue in this case contain the necessary relevant mandatory language discussed by the Supreme Court in *Thompson,* nor do they create a reasonable expectation in an inmate that he will be permitted to remain on work release as long as he obeys program rules. Because the Court finds that the Commonwealth has not created a liberty interest in remaining in the work release program, prison officials are not required to provide an inmate with due process upon his transfer from this program.

**C. Analysis of the Work Release Regulations.**

In the present case, the regulations applicable to Dominique's participation in the work release program are Chapter 103 of the Code of Massachusetts Regulations ("C.M.R."), Sections 420.00 (Classification) and 464.00 (Employment Programs Outside a Correctional Institution: Work Release), 103 C.M.R. §§ 420.00, 464.00.

Section 420.09 (Subsequent Classification Board Hearings) provides that inmate classification shall be reviewed at least once every six months and describes the procedures surrounding such hearings. That provision is mainly procedural and does not provide substantive direction to the administrators for deciding how to classify an inmate.

Section 464.01 (Purpose) states that the purpose of that section is "to establish guidelines governing work release programs for inmates" and that it "sets forth the requirements for participation in the work release program and for the administration of the work release program."

Section 464.09 (Approval Process for Program Participation) states that "[a]ny pre-release eligible inmate **may be approved** by the Commissioner for participation in Work Release Programs," (emphasis added). It is deemed significant that this section uses the discretionary term "may." The section delineates the decisionmaking procedures to be employed in determining whether an "eligible" inmate will be allowed to participate in the work release program.[3] The Court notes

---

**3.** 103 C.M.R. § 464.09 provides, in full, for the following approval process:
(1) The approval process at the institutional level for program participation shall be as follows:
(a) The Classification Committee shall make a recommendation to the Superintendent regarding an inmate's participation in the program.
(b) In considering the recommendation, the Classification Committee will review the inmate's case record, ensure eligibility, interview the inmate, determine the inmate's suitability for program participation and develop an individual written program plan based on:
1. program adjustment;
2. disciplinary record;
3. established goals;
4. involvement in work, education or training programs;

5. needs assessment;
6. potential benefits to the inmate;
7. safety of the community;
8. prior criminal history, parole/probation history and escape history.
(c) A designated staff member shall prepare a report including the facts of the inmate's record, the recommendation of the Classification Committee, the reasons for the recommendation, and other relevant factual data.
(d) Upon receiving the recommendation of the Classification Committee, the Superintendent shall make a recommendation to the Commissioner consistent with the Department classification process.
(2) The process for denials, appeals and review at the institutional level shall be as follows:

that certain sections of the regulations do supply particularized standards to guide the decisionmaking. For example, § 464.09(1)(b) directs the classification committee to consider an inmate's suitability for the program in light of his history and needs, as well as the needs of the community. While these sections of the regulations provide that the decisionmakers "shall" consider certain factors and follow certain procedural guidelines when reviewing an inmate's suitability for the work release program, they do *not* conclude that if these substantive predicates are satisfied, the inmate shall be allowed to participate in the work release program. Neither do the regulations state that an inmate must be allowed to continue in the work release program if he complies with program rules.

The Court finds that these regulations are, just as those considered by the First Circuit in *Lanier,* substantially procedural.

> Standing alone, these regulations do little to advance [plaintiff's] cause, as it is well settled that regulations that merely establish reclassification procedures without outlining substantive guidelines do not in themselves convey a protected liberty interest. *Lanier,* 876 F.2d at 247.

Furthermore, to the extent that the regulations do provide substantive guidelines for decisionmakers, such guidelines fail to create a liberty interest because they lack relevant mandatory language. As in *Thompson,* the regulations in this case "stop·short of requiring that a particular result is to be reached upon a finding that the substantive predicates are met." *Thompson,* 490 U.S. at 464, 109 S.Ct. at 1910. In particular, the guidelines do not mandate that if certain standards are met, continued participation in the program will be assured.

D. *Prior Case Law Finding State–Created Liberty Interests.*

Plaintiff, however, bases his claim to a liberty interest in continued work release participation on the "Community Release Agreement," a copy of which is attached to

---

(a) Each inmate shall be provided with a copy of the decision by the Superintendent to deny or approve program participation.
(b) Each denial shall include a review date within 90 days.

this memorandum. In *Brennan* and *Lanier,* the First Circuit held that inmates residing in halfway houses enjoyed liberty interests in remaining in those programs. In both cases, the state-created liberty interest was supported not by procedural regulations, but by implementing guidelines and community release permits similar to the agreement at issue here.

In *Brennan,* the First Circuit held that state regulations granted Brennan a protected liberty interest in remaining in the halfway house. The pertinent New Hampshire statute, N.H.Rev.Stat.Ann. § 651:25 (Supp. 1983), granted the State Prison Board broad discretion in returning prisoners to custody:

> The warden of the state prison may at any time recall a prisoner from such release status if he believes or has reason to believe the peace, safety, welfare, or security of the community may be endangered by the prisoner being under such release status.

The Court found, however, that a liberty interest was supported by implementing regulations which provided as follows:

> Placement at the Community Correction Center is a privilege of the New Hampshire State Prison system and residents who do not abide by the Center rules and regulations may be returned to the Prison. More specifically, violations of the following rules will result in immediate return to custody: [a—f, including introduction of drugs, use of violence, and "inability to adjust to the program," etc.]. Community Correction Centers—Handbook of Rules and Regulations ("Handbook"), Rule I:6 ("Return to Custody").

The Court concluded that the rule "contains an inclusive scheme for governing the return to custody of participants in the program." *Brennan,* 813 F.2d at 7.

The Court in *Brennan* also found that the Inmate Permit signed by the participants in the program further supported a reasonable

---

(c) The inmate may appeal the decision of the Classification Committee or of the Superintendent· according to the classification appeal process provided for in 103 CMR 420.00: Classification Policy.

expectation that participants would be returned to custody only after an infraction of the rules. The Permit verified that the inmate agreed to abide by the rules and regulations of the program, and understood that violations thereof would not be tolerated and would result in removal from the program. The Court concluded that the provisions of Rule I:6 constituted "particularized standards or criteria guiding the State's decisionmakers." In finding a state-created liberty interest, it held that the Rule and the Permit led the inmate to the reasonable belief that return to custody would result only from a violation of the rules.

Similarly, in *Lanier* the First Circuit considered the Massachusetts regulations regarding transfer from a community-based program to prison. Lanier based his claim to a liberty interest not merely on the procedural regulations, but on the "Manual of Operations for Community Reintegration Centers" ("Manual") and the Massachusetts Halfway House, Inc. ("MHHI") "Program Standards," both of which delineated rules governing the operation of halfway houses in the Commonwealth. Section 4.5(b) of the Manual stated that "Major or continuous violations of program standards may result in termination at the discretion of [prison officials]." The Rules provided that if inmates violated certain rules (e.g. possession of drugs, use of violence, escape, failure to comply with check-in procedures), they could be expelled from the community release program. In addition, Section 4.5(a)(1) of the Manual required the program director to issue a report containing specific reasons for an inmate's transfer.

The *Lanier* court found that:

These rules and procedures clearly indicate that an inmate's return to higher custody occurs as the result of a violation of one or more enumerated regulations. . . . And, as in *Brennan,* an inmate's expectation under the Massachusetts scheme arises not only from the program rules but from a "community release agreement" and a "community release permit" signed by the inmate and program officials. These documents state that an inmate agrees to be bound by the program rules and that violations of the rules may result

in disciplinary action or prosecution. Finally, both the Manual and the CMR's specifically provide for an "impartial hearing" by the DOC "for reviewing the facts and circumstances [of the termination], and for making appropriate recommendations regarding future placement." 103 CMR 420.07(7)(d); Manual, section 4.5(a)(7). *Lanier,* 876 F.2d at 248.

The *Lanier* Court concluded that the regulations contained the necessary "particularized standards" for decisionmaking, and created a legitimate expectation in the inmates that they will be returned to prison only for violating program rules. It held that Lanier had a protected liberty interest in remaining at the halfway house.

E. *Dominique's Claim to a State–Created Liberty Interest.*

The Court is cognizant of the similarities between the programs extant in *Brennan* and *Lanier,* and the program at issue here. In particular, the community release agreement signed by Dominique and current Department of Corrections officials provides, as do the *Brennan* and *Lanier* permits, that "any violation of community release policies will result in [the inmate] being subject to disciplinary action," and that the program participant is aware of the rules and agrees to abide by them. Furthermore, as in *Lanier,* upon transfer to a higher security facility, the current guidelines state that an inmate shall be afforded a reclassification hearing and a written report with findings. 103 C.M.R. §§ 420.08(6)(f) and 420.09(3)(a). While these similarities might support a holding that Dominique has established a reasonable expectation of remaining in the work release program absent a violation of the rules, this Court concludes that case law decided since *Brennan* and *Lanier* actually supports a contrary result.

In 1991, the First Circuit held that a community release agreement, or other "contracts" between an inmate and prison officials, can support a state-created liberty interest. *Rodi v. Ventetuolo,* 941 F.2d 22, 28 (1st Cir.1991). The language considered in *Rodi* was, however, clearly mandatory, and

even the Commonwealth conceded that it was the kind of language which could be properly held to support a liberty interest under *Thompson.* On the other hand, in *Smith v. Massachusetts Department of Corrections,* 936 F.2d 1390 (1st Cir.1991), where an inmate based his assertion of a liberty interest on state regulations and a contract with the Department of Corrections, the Court made the following observation:

> While these regulations [the reclassification procedures] provide that the prisoner shall receive notice and an opportunity to testify at a classification meeting, they do not contain any substantive predicates limiting the discretion of prison officials to reclassify an inmate. Accordingly, they cannot be held to create a cognizable liberty interest. *Cf. Lanier,* 876 F.2d at 247. Similarly, Smith's classification contract was phrased in discretionary terms and contained no language purporting to limit the commissioner's statutory discretion in ordering transfers. *Smith,* 936 F.2d at 1397.

The *Smith* Court did not ultimately rule on whether the inmate's contract supported a liberty interest because it found that his disciplinary violations constituted a breach of the contract which extinguished any liberty interest he may have had. However, the observation regarding the "discretionary terms" of the contract leads this Court to review the community release agreement for relevant mandatory language.

The First Circuit has recognized the importance of the mandatory language requirement delineated in *Thompson.* In *Bowser v. Vose,* 968 F.2d 105 (1st Cir.1992), the Court considered the Massachusetts furlough program regulations, and found that the "eligibility requirements [did] constitute substantive predicates intended to guide the decision whether to grant furlough." The Court concluded, however, that "[a]bsent from the regulations ... is any mandatory language directing that a furlough must be granted to any inmate who satisfies the eligibility requirements." *Bowser,* 968 F.2d at 108. In the case at bar, neither the regulations nor the community release agreement contains language that can be construed to require corrections officials to allow inmates to participate in the work release program, or to remain in the program once selected.

Moreover, viewing the community release agreement in the context of the entire regulatory scheme, this Court finds that an inmate could not reasonably expect to be entitled to remain on work release simply by avoiding any violation of the rules. Section 464.23 provides that the work release regulations shall be reviewed annually. The party conducting the review is directed to issue a memorandum detailing recommendations for "revisions, additions and deletions." 103 C.M.R. § 464.23. That provision implies that the Department of Corrections, in enacting these regulations, intended to retain the discretion to change program eligibility requirements and attendant administrative guidelines and procedures. Consequently, an inmate must reasonably assume that the work release program is subject to revision, and that the state has reserved the right to remove inmates from the program for reasons other than disciplinary violations.

Finally, as a matter of policy, this Court concludes that a system of perverse incentives would arise if courts were to find liberty interests in cases where state penal authorities create loose guidelines with respect to certain prisoner programs, while no federal due process requirements are applied to states which choose to enact no such guidelines at all. Justice Rehnquist, writing for the Court, made a similar observation in the *Hewitt* case:

> The creation of procedural guidelines to channel the decisionmaking of prison officials is, in the view of many experts in the field, a salutary development. It would be ironic to hold that when a State embarks on such desirable experimentations it thereby opens the door to scrutiny by the federal courts, while States that choose not to adopt such procedural provisions entirely avoid the strictures of the Due Process Clause. The adoption of such procedural guidelines, without more, suggests that it is these restrictions alone, and not those federal courts might also impose under the Fourteenth Amendment, that the State

chose to require. *Hewitt,* 459 U.S. at 471, 103 S.Ct. at 871.

After reviewing the current Massachusetts Work Release Program, this Court holds that the language and the structure of the regulations and the community release agreement do not provide for the kind of "if-then" decisionmaking process which is needed to support a state-created liberty interest. This holding is in accordance with the Supreme Court decision in *Thompson,* but perhaps equally important, it is also in accordance with policy concerns enunciated by the Supreme Court. A different finding could discourage states from creating work release and similarly progressive programs and leave them content to allow prisoners to languish in jail for the full duration of their sentences.

### F. *Plaintiff's Ex Post Facto Argument.*

When plaintiff was first removed from the work release program in April or May of 1994, he, arguably, remained eligible to participate in the program. The Commonwealth asserts that Dominique was returned to prison because he was deemed a security risk, and because he had been denied parole several times. Dominique asserts, and pursuant to Fed.R.Civ.P. 12(b)(6) the Court gives credence to his claim, that he and other inmates were removed from community release programs due to the public pressure and media outcry which followed the escape of Robert Stewart from the MCI–Lancaster community work release program.

In any case, the Commonwealth contends that under the newly revised regulations, Dominique is no longer eligible for participation in the work release program. In particular, the new regulations impose more stringent participation requirements on prisoners convicted of sex offenses. Sex Offender Treatment, Department of Corrections, 103 D.O.C. § 446 (1994). At the oral hearing, the plaintiff asserted that these recent revisions deprive him of his constitutional rights as they constitute ex post facto punishment. The First Circuit has held that the ex post facto clause of the Constitution pertains only to punishments inflicted by the government. *Martel v. Fridovich,* 14 F.3d 1 (1st Cir.1993). The dispositive issue, therefore, is whether the change in the regulations constitutes "punishment" by the government or not.

In *Martel,* the First Circuit considered new rules governing the eligibility of certain prisoner/patients for participation in short-term release programs. Under the new rules, Martel was no longer eligible to participate in short-term release because he was "under a criminal sentence and [was] neither paroled to the Treatment Center nor eligible for parole." *Id.* at 2. Martel claimed that this change in the rules violated his rights against ex post facto legislation.

The First Circuit rejected Martel's argument on the grounds that the change in the rules was not punitive. The Court found that the revised regulations were related to community safety, and not to retribution or deterrence. *See United States v. Halper,* 490 U.S. 435, 448, 109 S.Ct. 1892, 1901–02, 104 L.Ed.2d 487 (1989) (where the Supreme Court held, in the Double Jeopardy context, that civil and criminal sanctions constitute punishment only when they serve the aims of retribution or deterrence.) In Martel's case, the First Circuit Court found that the change in the rules constituted a "revocation of a privilege voluntarily granted." *Martel,* 14 F.3d at 3, *citing Helvering v. Mitchell,* 303 U.S. 391, 399, 58 S.Ct. 630, 633, 82 L.Ed. 917 (1938). Consequently, the Court determined that the revision of the program rules did not implicate the ex post facto clause.

In this case, the Court finds that the recent revisions in the work release program are driven by safety concerns, and not by a desire to impose further punishment on prisoners. Participation in the work release program is a privilege, and the state is entitled to revoke that privilege if it finds that such a measure is necessary to ensure the safety of the community from sex offenders and other violent criminals. Consequently, this Court finds that Dominique's argument pursuant to the ex post facto clause of the Constitution fails to state a claim upon which relief can be granted.

### G. *Plaintiff's Loss of His Driver's License.*

In his *pro se* complaint, plaintiff asserts that his rights were violated when prison

officials revoked his driver's license and denied him use of his personal vehicle. While plaintiff alleges that the loss of his license violated his rights under the First, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, the only argument pressed by his attorney at the oral hearing, and the only claim with any colorable merit, is his claim under the Fourteenth Amendment. Plaintiff's counsel suggested that plaintiff has an established liberty interest in retaining his driver's license, and that the summary revocation thereof denied him due process.

 First, the Court finds that the Due Process Clause does not independently support a liberty interest in a prisoner's driver's license. *See Bowser*, 968 F.2d 105 (where the First Circuit held that plaintiff inmate had no inherent liberty interest in continuing to participate in the Massachusetts furlough program, despite the fact that he had previously completed many furloughs). Second, the plaintiff has failed to cite, and the Court is unaware of any state law or regulation which would support a finding that certain state prisoners can reasonably expect to receive and retain use of a driver's license at any point during incarceration. Furthermore, the fact that plaintiff had used his license without incident for several years does not serve to create a reasonable expectation that he may retain his license indefinitely. Courts have noted that a liberty interest must be grounded in more than an inmate's desire and unilateral hope. *Thompson*, 490 U.S. at 459–61, 109 S.Ct. at 1908. Consequently, the revocation of the license did not deprive plaintiff of his constitutional rights, and any allegation to the contrary is dismissed for failure to state a claim upon which relief can be granted.

### H. *The MCRA and Other Remaining State Law Claims.*

Plaintiff's *pro se* complaint also contains several state law claims. In particular, plaintiff contends that 1) his removal from the community work release program caused him severe emotional and mental distress, 2) such removal and the loss of his license violated M.G.L. c. 124 §§ 1–9, c. 127 §§ 20, 32, 48, 49A, c. 30A § 1 *et seq.*, and his state constitutional rights pursuant to Articles I, X, XI, XII, XV, XVI and XXIV of the Massachusetts Articles of Declaration, and 3) defendants have violated the MCRA, M.G.L. c. 12 §§ 11H–11J, by threatening to transfer him to a higher security prison because he has insisted upon prosecuting this and other cases against state and prison officials. Because all of plaintiff's federal claims have been dismissed, this Court declines, pursuant to 28 U.S.C. § 1367(c)(3), to consider those pendent state law claims which are hereby dismissed without prejudice.

### I. *The Preliminary Injunction.*

Finally, because defendants' motion to dismiss will be allowed with respect to the Section 1983 claim, plaintiff has not demonstrated a likelihood of success on the merits of his case. Consequently, the motion for a preliminary injunction pursuant to Fed.R.Civ.P. 65 will be denied.

### ORDER

For the foregoing reasons, it is hereby ordered that:

1) Defendant's motion to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6) and/or Fed.R.Civ.P. 56, with respect to plaintiff's federal claims under 42 U.S.C. § 1983, is **ALLOWED;**

2) Defendant's motion to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6) and/or Fed.R.Civ.P. 56, with respect to plaintiff's state law claims, is **DENIED;**

3) Plaintiff's motion for injunctive relief pursuant to Fed.R.Civ.P. 65, is **DENIED;** and

4) Plaintiff's state law claims are dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

SO ORDERED.

### ATTACHMENT

### LANCASTER PRE–RELEASE CENTER COMMUNITY RELEASE AGREEMENT

In accepting and participating in community release programs including all furloughs,

work release, and education release opportunities, I voluntarily accept the following conditions:

1. I will conduct myself in accordance with the laws of the state and community and will return to the pre-release center at the designated time.

2. While participating in community release programs: furloughs, work release, education release, and PRA's, I will not leave the Commonwealth of Massachusetts.

3. I understand that I may be asked to submit to a medical examination upon my return to the institution (i.e., blood test, urinalysis, etc.) and agree to cooperate with the medical personnel during the examination.

4. I understand that failure to return from any community program or activity will be considered an escape and that as a result I will be subject to prosecution. (Mass.G.L., Chapter 268, Section 16 states: "That a prisoner who escapes or attempts to escape from a penal institution shall be punished by imprisonment for not more than ten years".)

5. I understand that anyone involved in the Work Release Program who brings or attempts to bring into said institution an illegal drug, gun, knife or similar weapon as defined in Section 10 of Chapter 269, of General Laws shall be punished by additional sentence of not less than seven or more than ten years in state prison.

6. That I will not leave my assigned work release location during my daily lunch break or coffee breaks for any reasons unless duly authorized by MCI–Lancaster staff.

7. Any violation of community release policies will result in my being subject to disciplinary action or prosecution and will not be considered in the future community participation requests.

8. I understand that all assigned lockers, foot lockers or any other pertinent storage at outside work areas will be subject to search by staff members.

9. That I will be aware of the conditions and specific arrangements for each specific community release activity and that I will abide by these arrangements and conditions.

I have read and/or had the above read and explained to me, and I accept and understand them completely.

PRESIDENT [Signature]

COORDINATOR [Signature]

COUNSELOR [Signature]

DATE: 8–6–90